**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Cecilio CALVILLO, Andrew Clifton Payne
and Roy Lee Burke,
Defendants-Appellants.**

No. 75–3539.

United States Court of Appeals,
Fifth Circuit.

Aug. 16, 1976.

Rehearing Denied Oct. 18, 1976.

Oscar J. Pena, Laredo, Tex., for Calvillo.

John A. Nuckolls, Atlanta, Ga., for Payne and Burke.

Edward B. McDonough, Jr., U. S. Atty., James R. Gough, George A. Kelt, Jr., Rene J. Gonzalez, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before TUTTLE, AINSWORTH and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The dispositive issue in this direct criminal appeal is the legality of a search conducted by Border Patrol agents at a traffic checkpoint on Highway 59 between Laredo and Freer, Texas. To sustain the search, the government was required to show either that 1) the Freer checkpoint was the functional equivalent of the border, or 2) probable cause for the search. *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). Since neither alternative was proven, we hold the search invalid, the evidence discovered thereby illegally obtained, and reverse appellants' convictions which depended on that evidence.

Calvillo, Payne and Burke were convicted of conspiracy to possess and aiding and abetting in the possession of approximately 285 lbs. of marijuana. 21 U.S.C.

§ 841(a)(1); 18 U.S.C. § 2. Payne was also found guilty of carrying a firearm during commission of a felony. 18 U.S.C. § 924(c)(2).[1] The characteristics of the checkpoint as well as the facts surrounding the search are relevant to appellants' Fourth Amendment challenge.

The Freer traffic checkpoint is strategically located approximately 30.1 miles east of the border city of Laredo, Texas, on Highway 59, the major route from Laredo to Houston. Only one small country road intersects Highway 59 between the Laredo city limits and the checkpoint. Directly to the east of the checkpoint is one other intersecting paved road on which Border Patrol agents also control traffic. Leading from the border area there is an interior road network providing a possible indirect route to the checkpoint location. Testimony at the suppression hearing established that the Freer checkpoint had relocated three times in the five-year period prior to the search. It has been at its present location, however, from at least September 1, 1974.

At the time of the search, the checkpoint consisted merely of a mobile van parked on the unpaved shoulder of the road. Although classified as permanent by the Immigration and Naturalization Service, the checkpoint's only permanent fixtures were a light standard and a 220 volt electric outlet. When the checkpoint was in operation, the border patrolmen set up portable warning signs and blinking lights on the highway at designated distances from the van. A large sign directed traffic to stop at the point itself. The practice was to visually inspect all vehicles passing through, but only about 41% of the cars were stopped for questioning. The agents searched only a portion of the vehicles stopped. During the relevant two-month period (April and May 1975), the checkpoint operated for only four days.

The challenged search occurred on the evening of May 2, 1975. No precise chronology of events can be gleaned from the often inconsistent testimony of the Border Patrol and DEA agents who testified at the pretrial suppression hearing and at the trial itself. The facts are recited in a manner most favorable to the government's position.

At 9:30 p. m. on the night in question, Border Patrol agent Carl Phillips, stationed approximately one-half mile south of the checkpoint, spotted a car flashing its headlights as if to signal danger. He immediately notified the checkpoint of the suspicious activity. Although Phillips did not note the make of the car with the flashing lights, he recalled that three vehicles had passed him during a very brief time span. Approximately 15 minutes after the alert from Phillips, a 1971 Oldsmobile driven by Rosan Hill approached the checkpoint and stopped. Border Patrol agent Sanderfer, stationed at the checkpoint, questioned Hill about her nationality. As he did so, he detected a perfumed odor which he suspected was too strong to be coming from the woman's person. He then requested Hill to open the trunk of her car. Inside were six suitcases together with some fishing tackle. During this time, a Ford driven by Burke with passengers Payne and Calvillo drove up. Another agent, Maurio Zertuche, approached the Ford and noticed that the men seemed very interested in the Oldsmobile and had "unusual" facial expressions. Zertuche recalled that Calvillo tugged at or nudged Payne. The agent then questioned the three men about their citizenship and asked where they were heading. After receiving a reply that they were going fishing, Zertuche ordered Payne to pull over and open the trunk of the Ford.

By this time, agent Sanderfer had opened the suitcases in the Oldsmobile and had uncovered a large quantity of marijuana bricks masked with talcum powder. The proof as to whether Sanderfer related this discovery to Zertuche is conflicting. San-

---

1. By definition, the gun-carrying charge is dependent on proof of Payne's commission of the drug-related felony. Thus by invalidating the marijuana conviction, we necessarily reverse this count also.

derfer testified that the agents exchanged no information. Zertuche claimed that Sanderfer told him that "the young lady had marijuana." In any event, the appellants' Ford was subsequently thoroughly searched. A jar of talcum powder and a spare tire matching the Oldsmobile were found. The other linking evidence consisted of an address book belonging to Calvillo which contained Rosan Hill's name and the Oldsmobile's title certificate which listed the same address as that shown on a fishing license issued to Calvillo.

At the suppression hearing, the government took the position that the Freer checkpoint was a functional equivalent of the border. Much testimony was devoted to describing the location and the physical setup of the checking operation. Although a probable cause justification was not explicitly relied on, the facts surrounding the search of both cars were also explored in some depth. The district court did not give any reasons for denying the suppression motion.

I. Functional Equivalency

■ *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) established the rule that in the absence of probable cause, routine searches by Border Patrol agents may be made only at the border itself or its functional equivalent. While elaborating on the quantum of knowledge needed for stops and interrogations at "border" locations, the progeny of *Almeida-Sanchez* has not altered this basic search rule. The difficulty lies in determining which locations qualify for functional equivalency status. *Almeida-Sanchez* gave two illustrations:

> For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

413 U.S. at 272, 93 S.Ct. at 2535.

The major functional equivalency case in this circuit is *United States v. Hart*, 506 F.2d 887 (5th Cir. 1975), which dispenses with the probable cause requirement for immigration searches conducted at the Sierra Blanca permanent checkpoint. *Hart* cited three general characteristics which serve to transform a checkpoint into the border's functional equivalent: the proximity of the checkpoint to the border, the permanent nature of the checkpoint and the hours of its operation. The court thereupon concluded that the Sierra Blanca checkpoint passed the functional equivalency test because of its location on U. S. Highway 10 which paralleled the border for some distance before turning north to the checkpoint; its permanency as an established checkpoint office consisting of trailer mounted on blocks; its operation 16 hours each weekday and 24 hours per day on weekends, when ports of entry were shut down; and its proven effectiveness as a spot for apprehending aliens. 506 F.2d at 896–97.

*Hart* was vacated and remanded by the Supreme Court following the *Ortiz* decision prohibiting routine searches at permanent checkpoints. 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975). Despite the implicit recognition in *Ortiz* that not all reasonably located permanent checkpoints should be automatically classifiable as functional equivalents of the border,[2] we adhered to our original classification of the Sierra Blanca checkpoint as a border equivalent. *United States v. Hart*, 525 F.2d 1199 (5th Cir. 1976) (on remand). Although the final fate of our *Hart* reanalysis is uncertain, it is clear that the functional equivalency label is one not to be lightly bestowed.

The Freer checkpoint is not a good candidate for functional equivalent status. Applying the *Hart* factors to Freer's operation

---

2. See also, *United States v. Martinez-Fuerte*, —— U.S. ——, 96 S.Ct. 3074, 48 L.Ed.2d —— (1976).

as it existed at the time of the search yields consistent negative results. The checkpoint could hardly be described as permanent; except for the light standard and 220 volt electric outlet, the equipment was entirely mobile. During the relevant time-frame, the periods of operation were scant—only four days out of sixty. Most importantly, even if we accept the Immigration Service's classification of Freer as a permanent checkpoint,[3] the point's location does not compel a finding that it functioned in a manner similar to a station located at the border itself. There is no showing that the vehicles passing through the Freer checkpoint were likely to have recently crossed the border or that the area was a natural collecting point for illegal aliens making their way into the interior. Border equivalency is also seriously impaired by the point's location 30 miles interior from the sizeable urban area in and around Laredo and on the most direct highway route between Laredo and the metropolis of Houston. Absent a closer resemblance to the "established station at the confluence of two or more roads" example given by the Supreme Court, we refuse to grant functional equivalency status to the Freer operation. This ruling by no means suggests that the checkpoint is not strategically or reasonably located or that it is not a good site for an established station. We hold that on the basis of the present record, these searches at Freer cannot be insulated from the probable cause requirement.

## II. Probable Cause

■ This circuit requires all post *Almeida-Sanchez* border searches to be predicated on probable cause unless conducted at the border or its functional equivalent. Even checkpoint searches which occurred in the interim between the *Almeida-Sanchez* and *Ortiz* decisions are governed by the same stringent measure. *United States v. Martinez,* 526 F.2d 954 (5th Cir. 1976) ( *Ortiz* held retroactive). This uniform standard differs from the quantum of knowledge required for an initial brief stop and citizenship interrogation which varies with the type of checkpoint operation involved. While roving Border Patrol officers need at least reasonable suspicion to selectively stop motorists for questioning, *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), a vehicle can be routinely stopped at a reasonably located permanent checkpoint without any prior knowledge or suspicion. *United States v. Martinez-Fuerte,* —— U.S. ——, 96 S.Ct. 3074, 48 L.Ed.2d —— (1976).[4]

■ To resolve the search issue in this case, we need only decide whether the officers had probable cause to search the Ford.[5] Because of our disposition of this issue, there is no reason to explore the related questions of the propriety of the initial stop of the two cars or the proper classification of Freer as a permanent as opposed to temporary or roving checkpoint. Neither must we pass on the validity of the search of the Oldsmobile or appellants' standing to suppress evidence seized from it. The inquiry ends without determination that prior to the search of the trunk of the Ford, the officers had no probable cause to believe that appellants were linked to either Rosan Hill or the contraband in the Oldsmobile.

3. In its most recent border search decision, the Supreme Court emphasized that the choice of checkpoint locations should be left largely to the discretion of Border Patrol officials. *United States v. Martinez-Fuertes,* —— U.S. ——, 96 S.Ct. 3074, 3083, n. 13, 48 L.Ed.2d —— (1976). A similar deference might also be accorded to the checkpoint's official classification as permanent or temporary.

4. The holding in *Martinez-Fuerte* is expressly confined to permanent checkpoints. —— U.S. at ——, 96 S.Ct. at 3087, n. 19. The question of the propriety of a routine stop at a temporary checkpoint has not been directly decided. The Court may choose to treat temporary checkpoint searches as if conducted by roving patrols.

5. The government's attempt on appeal to characterize the thorough-going search of the Ford as a mere "inspection" not subject to Fourth Amendment strictures is totally unsupported by the undisputed facts of this case. Thus the "inspection" discussion in *Ortiz* is inapplicable here. *United States v. Ortiz,* 422 U.S. 891, 915, 95 S.Ct. 2585, 2598 n. 3, 45 L.Ed.2d 623 (1975).

The record discloses only three factors that even remotely suggest that appellants were engaged in a joint criminal enterprise with Rosan Hill: 1) the flashing-lights warning from agent Phillips; 2) the proximity of arrival of the two vehicles; and 3) the expressions of interest displayed by the occupants of the Ford. Their composite weight does not rise to the level of probable cause.

First, agent Phillips' observation and report of flashing vehicle lights was not probative of any connection between the Oldsmobile and Ford; Phillips could not describe the make of the signaling car. Moreover, the comparatively long interval between notification and approach of the Oldsmobile to the checkpoint suggests that Phillips' warning was unrelated to the target vehicles. It is thus not surprising that the government did not reveal this now alleged link at the suppression hearing. The second and third factors are relevant but neither alone nor together are enough to raise more than a vague suspicion that the vehicles were linked. Although the evidence is not altogether clear on this point, we assume that no intervening vehicle approached the checkpoint between the stopping of the Oldsmobile and the arrival of the Ford. Accepting the government's version of the chronology ( i. e., that the search of the Ford was not undertaken until after the discovery of the marijuana), makes it more plausible that the Border Patrol agents would view the occupants of the Ford as possible suspects based on the temporal and physical proximity of the vehicles. It is equally certain, however, that this weak evidentiary connection cannot sustain the intrusion, else all citizens unfortunate enough to travel behind smugglers would forfeit their Fourth Amendment rights. Finally, the appellants' reactions to the stop and search of Hill's car were not sufficiently unusual to arouse even a founded suspicion. While the appearance and behavior of the driver and passengers are permissible factors in calculating probable cause, *United States v. Ortiz,* 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975), only unambiguous actions can be accorded controlling weight. Here, officer Zertuche noted only that the men seemed very interested in what was happening to the Oldsmobile. This circumstantial deduction is incompatible with the natural curiosity persons display in such citizen-police encounters, especially when the interested citizen may well be subject to the same type action. Common sense dictates that if the men had shown no interest at all, that could have been even more suspicious.

In sum, the officer's subjective unarticulated hunch that the two vehicles were related is simply not enough to give a prudent man reasonable grounds for believing that an offense was being committed. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 59 L.Ed. 543 (1925). *See also, United States v. Estrada,* 526 F.2d 357, 358 (5th Cir. 1976). Without probable cause or consent the checkpoint search of the Ford was illegal and the fruits of that search should have been suppressed. Since the improper admission of this evidence requires reversal, we do not reach appellants' other contentions.

REVERSED.