[Crim. No. 36420. Second Dist., Div. One. Nov. 13, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
TOBY ST. GEORGE MATTHEWS, Defendant and Appellant.

14

COUNSEL

David LaMonte Williams for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Juliet H. Swoboda and Donald R. Currier, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, Acting P. J.—Defendant appeals from judgment (order granting probation) entered on jury verdict of guilty of illegal transportation

of marijuana (§ 11360, subd. (a), Health & Saf. Code). The appellate issues relate primarily to search and seizure of the contraband narcotics.

EVIDENCE TAKEN ON THE MOTION TO
SUPPRESS (§ 1538.5, PEN. CODE)

Officer McCauley, a detector dog handler for the United States Customs Service was assigned to various areas to work with his dog Humphrey who is trained to alert for narcotics.[1] On December 26 he was assigned by customs to Pasha car terminal, Pier J, Berth 242, Long Beach, a terminal for the importation of automobiles into the United States; 66 privately owned cars had been taken from the ship and stored at Pasha awaiting a check for contraband narcotics by customs before delivery to the consignees. Officer McCauley's function was to check the vehicles for contraband narcotics by using Humphrey to sniff the air surrounding them; he and Humphrey walked past the cars in this fashion and Humphrey registered no reaction until he came to the last car, a 1970 Maserati to which Humphrey alerted—he picked up the scent at the front of the vehicle, proceeded toward the underside of the car, and when he got under it he started to bite and scratch—his normal training alert for narcotics. At this point Officer McCauley pulled Humphrey away, made no further inspection but radioed to an inspection team which arrived 10 minutes later.

Officer McCauley told Inspector LaFata that Humphrey had alerted the Maserati, and ran Humphrey again; Humphrey alerted to the underside of the Maserati. Based on Humphrey's alert, LaFata drilled with a portable drill 2 or 3 one-eighth inch holes into the frame underneath the car; this produced a substance on the end of the drill bit "that appeared to be hashish" (Inspector LaFata had been trained by customs and Federal Drug Administration to interdict narcotics); on the spot he

---

[1]Adequate foundation was laid establishing the reliability of Humphrey as an investigative device. The trial judge established the expertise of Humphrey by examining Officer McCauley at length concerning Humphrey's training, experience and ability. This line of questioning developed the following: the training course for detector dogs is given in the east for 12 weeks by the United States Customs Service; the dog is evaluated at the end of 9 weeks; if he passes, he continues training, and at the end of 12 weeks is reviewed again; of 6 dogs in his class Humphrey ranked 5th but since then he has been reevaluated, and out of 10 dogs in the Los Angeles district he scored the highest; this evaluation was 2 months prior to the incident herein; last year (1978) Humphrey ran inspection of 900 to 1,000 cars; "he is about 99, 98 percent accurate."

ran a field test which reacted positive and confirmed his suspicion that the substance was hashish. The Maserati was then taken under seizure to the customs house. An inspection of floorboards under the rear seat revealed alteration; when the altered plate was pried up, eight pounds of hashish were found wrapped in separate cellophane packages stuffed into an aluminum compartment in the frame of the car; the narcotic was removed. Officer Cleveland, United States Customs Patrol, removed and initialed one of the pieces of narcotics and replaced it in the Maserati; the vehicle was restored to its prior condition.

On January 3, 1980, customs released the Maserati to defendant in Long Beach; he drove it to his home in Pasadena under the surveillance of Officer Cleveland and Long Beach police; defendant remained in the car and appeared to check various areas and to lift the rear seat. Defendant was asked to step out of the car and placed under arrest; the rear seat had been removed from its attachments.

Appellant's main complaint is that the search of the Maserati at the Pasha car terminal was illegal for lack of probable cause to believe it contained contraband narcotics thus it was an exploratory search violative of the federal and state Constitutions. We conclude in the circumstances here that the search constituted a custom's search in a "border area" which must meet the Fourth Amendment test of reasonableness but requires neither a warrant nor probable cause; and that on the basis of those facts known to the custom's inspector at the time, the search of the vehicle was reasonable.

The section 1538.5 motion was heard de novo. Thus, vested in the trial court was the power to determine the credibility of witnesses, resolve conflicts in the testimony, weigh the evidence and draw factual inferences. (*People* v. *West* (1970) 3 Cal.3d 595, 602 [91 Cal.Rptr. 385, 477 P.2d 409].) On appeal presumptions favor the existence of that power and the findings express or implied on such matters must be upheld if supported by substantial evidence. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) Here the court had the duty to determine whether or not on the facts presented, the search was within the meaning of the federal Constitution. Where the evidence on such issue is not in dispute the issue is one of law to which the substantial evidence rule does not apply. (*People* v. *Bigham* (1975) 49 Cal. App.3d 73, 76 [122 Cal.Rptr. 252]); here it appears to be a question of

mixed law and fact. Thus we presume in support of the trial court's finding whatever inferences could have been reasonably drawn from the evidence by the trial court, and measure the facts against the constitutional standard of reasonableness. As to the issue of where defendant was arrested, there was some conflict; the trial court found he was arrested outside of his residence as he exited his vehicle. To this finding we apply the substantial evidence rule. Appellant seeks to invoke the rule of *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333] because the arrest was made without a warrant. However, there is more than ample evidence to support the trial court's finding based on the testimony of Officer Northrup and defendant's sister.

That the Pasha car terminal at the Port of Long Beach is a part of the "border area" which "includes not only land border crossing checkpoints, but also checkpoints at all ports of entry" (*People* v. *Superior Court* (*Randall*) (1973) 33 Cal.App.3d 523, 529 [109 Cal.Rptr. 143]), and Customs Officer McCauley and Humphrey had a right to be there for the purpose of checking the imported cars for contraband narcotics is established in the evidence. The Pasha Company lot (Pier J, Berth 242), is chain link fenced with gate and guard; although privately owned, it was approved by the United States Customs Service for customs jurisdiction upon application of Pasha Company, and specifically is a terminal for importation of automobiles into the United States by ship. Such a lot is approved on application of a company to have imported cargo kept there by submitting to the approval of customs, fencing it, providing a security system and posting bond. Those members of the public who have business with customs or the shipping company are permitted on the lot, the general public is "not supposed to be there." The lot is a bonded area, a customs security area operated "under the auspices of Customs"; it exists as a terminal "with the graces of Customs" and it must comply with customs' regulations and be available to customs for security reasons. The customs service has jurisdiction over the Pasha car terminal for the importation of cars. Upon arrival automobiles imported into the United States by ship are removed therefrom, checked for damage and kept by customs in Pasha car terminal to be checked for contraband by customs inspectors before being released to the consignees. Customs officials conduct inspections "routinely" through the Pasha Company lot; and it is Officer McCauley's function with the aid of his detector dog to check the cars for contraband narcotics; he is assigned by customs to the lot for that purpose for which he is allowed into the area.

It is at once apparent that the imported automobiles kept at Pasha are under the dominion, custody and control of the United States Customs Service; and that the routine inspection of cars for contraband narcotics is made by customs officials at Pasha car terminal, a place specifically approved by customs for that purpose, as soon as the cars are transferred from the ship. Defendant shipped his Maserati from England to the United States; it arrived at the Port of Long Beach where it was removed from the ship and transferred to the Pasha Company lot where it was held in the custody of customs for inspection for contraband by customs officials. There is little doubt that the Maserati at Pasha car terminal was in the custody and control of customs at the time the inspection for contraband narcotics was made (cf. *People v. Whỳte* (1975) 90 Cal.App.3d 235, 243-244 [152 Cal.Rptr. 280]): and that customs officials had a right to be there for that purpose. Thus the search of the Maserati at the Pasha Company lot was a custom's search conducted in a "border area" at a port of entry.

■ A "border search," which customs inspectors are authorized to conduct upon entry of persons or vehicles to the United States is of the broadest possible character and its validity must be determined in accordance with federal law, and there is no question of probable cause under state law. (*People v. Kosoff* (1973) 34 Cal.App.3d 920, 930 [110 Cal.Rptr. 391]; *People v. Superior Court (Randall)* (1973) 33 Cal. App.3d 523, 528-529 [109 Cal.Rptr. 143]; *People v. Eggleston* (1971) 15 Cal.3d 1026, 1029 [93 Cal.Rptr. 776]; *People v. Clark* (1969) 2 Cal.App.3d 510, 518 [82 Cal.Rptr. 682]; *People v. Mitchell* (1969) 275 Cal.App.2d 351, 355 [79 Cal.Rptr. 764].) "The term 'border search' is 'the courts' shorthand way of defining the limitation that the Fourth Amendment imposes upon the right of customs agents to search without probable cause'; a right that is 'predicated on the right and obligation of the government. . . to prevent the importation of contraband or of undeclared, and therefore, untaxed merchandise, and on the universal understanding that persons, parcels and vehicles crossing the border may be searched.' *United States v. Weil* (9th Cir. 1970) 432 F.2d 1320, 1323, cert. den., 401 U.S. 947 [28 L.Ed.2d 230, 91 S.Ct. 933].)" (*People v. Superior Court (Randall)* (1973) 33 Cal.App.3d 523, 529 [109 Cal.Rptr. 143].)

■ Although here there is no issue of warrant or probable cause under state law, a border search nevertheless must meet the Fourth Amendment test of reasonableness under federal standards. An intru-

sive search can satisfy Fourth Amendment requirements even though made on the mere suspicion of customs agents of the presence of contraband or undeclared dutiable articles; if the inspection is nonintrusive not even suspicion is necessary. (*People* v. *Superior Court* (*Randall*) (1973) 33 Cal.App.3d 523, 529-530 [109 Cal.Rptr. 143].) Said the court in *Randall*: "Not even suspicion is required to justify a nonintrusive inspection of persons, their vehicles and effects at a border crossing. (*Henderson* v. *United States, supra,* 390 F.2d 805, 808; 19 U.S.C. § 1496.) The fact of entry alone is sufficient reason for such a search. (*Klein* v. *United States* (9th Cir. 1973) 472 F.2d 847, 849; *Witt* v. *United States* (9th Cir. 1961) 287 F.2d 389, 391, cert. den., 366 U.S. 950 [6 L.Ed.2d 1242, 81 S.Ct. 1904].) When merchandise is received from abroad, it must be held under bond 'until it has been inspected, examined, or appraised,'..." (*People* v. *Superior Court* (*Randall*) (1973) 33 Cal.App.3d 523, 530-531 [109 Cal.Rptr. 143].)

Officer McCauley was assigned and he did conduct a routine customs inspection of the imported cars in the Pasha car terminal for contraband narcotics; it was done in a clearly nonintrusive manner with the aid of a trained detector dog who did no more than sniff the air surrounding the vehicles including the Maserati. Humphrey's alert to the underside of the Maserati did not in any way intrude into or disturb the vehicle. The use of narcotic trained detector dogs is not uncommon, and federal courts have analyzed such use in various cases. In all cases the courts have held that sniffing the air surrounding an object is neither an intrusion nor a search. In the Ninth Circuit, the court of appeals in *United States* v. *Solis* (9th Cir. 1976) 536 F.2d 880 held that the use of detector dogs to sniff the air surrounding a parked semitrailer was reasonable and therefore not a prohibited search under the Fourth Amendment. Said the court at pages 882-883: "The dogs' intrusion such as it was onto the air space open to the public in the vicinity of the trailer appears to us reasonably tolerable in our society. There was no invasion of the 'curtilage'—the trailer. No sophisticated mechanical or electronic devices were used. The investigation was not indiscriminate, but solely directed to the particular contraband. There was an expectation that the odor would emanate from the trailer. Efforts made to mask it were visible. The method used by the officers was inoffensive. There was no embarrassment to or search of the person. The target was a physical fact indicative of possible crime, not protected communications." Other circuits have also held that sniffing by a trained canine of the air surrounding an object is not a search (*United States* v. *Venema* (10th Cir. 1977) 563 F.2d 1003, 1005, 1007 [dog sniffed air outside of defendant's

locker; not a search]; *United States* v. *Bronstein* (2d Cir. 1975) 521 F.2d 459, 461-463, cert. den. 424 U.S. 918 [47 L.Ed.2d 324, 96 S.Ct. 1121] [sniffing of canine at baggage terminal not constitute search; no reasonable expectation of privacy by one transporting baggage by plane; use of trained dog no different than police officer detecting odor of narcotics through olfactory senses]; *United States* v. *Fulero* (D.C. Cir. 1974) 498 F.2d 748, 749 [dog sniffed air around footlocker in bus depot; court labeled as "frivolous" contention this was unconstitutional intrusion into lockers]). In *Solis, Bronstein, Venema* and *Fulero* law enforcement officers had prior information or tips which were corroborated by a trained dog; but in none of these cases was there a *customs or border inspection or arrest*. In *United States* v. *Race* (1st Cir. 1976) 529 F.2d 12, 14, the arrest was by customs at port of entry; the court approved the use of detector dogs, although it said that a trained dog's reaction alone is not sufficient probable cause for "arrest" (p. 14). In *Doe* v. *Renfrow* (N.D.Ind. 1979) 475 F.Supp. 1012, 1020, there was no independent information by school authorities who used detector dogs to sniff out narcotics on person of students in a public school; the court held it was "a minimal intrusion at best and not so serious as to invoke the protections of the Fourth Amendment." (P. 1020.)

Various state authorities also approve the use of narcotic detector dogs; few cases discuss whether sniffing of the air around an object by detector dogs constitutes a search although some hold that it does and if not based on reasonable suspicion constitutes an exploratory search (*People* v. *Evans* (1977) 65 Cal.App.3d 924, 936 [134 Cal.Rptr. 436]; *People* v. *Williams* (1975) 51 Cal.App.3d 346, 350 [124 Cal.Rptr. 253]); others discuss the necessity of establishing the dog's expertise (*People* v. *Evans* (1977) 65 Cal.App.3d 924, 933, 936 [134 Cal.Rptr. 436]; *People* v. *Furman* (1973) 30 Cal.App.3d 454, 457 [106 Cal.Rptr. 366]) and whether or not the dog and his handler were in a place where they had a right to be (*People* v. *Evans* (1977) 65 Cal.App.3d 924, 933 [134 Cal.Rptr. 436]; *People* v. *Williams* (1975) 51 Cal.App.3d 346, 350 [124 Cal.Rptr. 253]); and one indicates a canine check to be nonintrusive (*People* v. *Lester* (1980) 101 Cal.App.3d 613, 615 [161 Cal. Rptr. 703] [officials investigated tip by use of detector dog; constituted probable cause to arrest defendant; the court approved use of dog in investigation "without interfering with Lester's rights."]). None of the state cases involves a *border or customs investigation.*

In the case at bench, if Humphrey's sniffing the open air surrounding the Maserati in a place where he had a right to be constitutes a search,

it was an entirely nonintrusive one. There was no invasion of the Maserati and Humphrey merely reacted to the scent emanating from the underside of the vehicle. Humphrey's expertise had been established; there was an expectation that the odor of eight pounds of hashish would emanate from the vehicle in fact, the narcotic was found in an aluminum compartment inserted into the frame. Thus, inasmuch as this took place in a "border area" at a port of entry by a customs official in a place under the control of customs, not even suspicion was required to justify the nonintrusive inspection of the vehicle. (*People* v. *Superior Court* (*Randall*) (1973) 33 Cal.App.3d 523, 530 [109 Cal. Rptr. 143].)

The first intrusion, although minimal in nature, in the instant case was the drilling of two or three one-eighth-inch holes in the frame on the underside of the Maserati. The amount of suspicion necessary to satisfy the reasonableness test depends on the facts and circumstances of each case, and the greater the intrusion on a person's reasonable expectation of privacy, the greater the suspicion must be. (*People* v. *Superior Court* (*Randall*) (1973) 33 Cal.App.3d 523, 529-530 [109 Cal.Rptr. 143].) First, this was a "border search." Second, the reasonable suspicion here that contraband narcotics were in the Maserati was based upon the expertise of a trained detector dog whose credentials were established and whose handler had a right to be in the Pasha car lot. Third, such reasonable suspicion was formed by a customs inspector (LaFata) especially trained to interdict contraband narcotics in items imported into the United States. Fourth, the intrusion was minimal. A search of a vehicle is far less intrusive than searches of persons or their immediate effects. (*United States* v. *Doe* (2d Cir. 1973) 472 F.2d 982, 984-985.) At this point the Maserati was not dismantled or torn apart, neither was it entered. The search constituted merely a drilling two or three one-eighth-inch holes in the frame underneath the car. Finally, there was no impermissible invasion of defendant's reasonable expectation of privacy during the time the vehicle he had imported from England into the United States was under the dominion and control of customs officials at the port of entry. For an invasion of privacy that would increase the amount of suspicion necessary to satisfy the reasonableness test of the Fourth Amendment, there must be an actual (subjective) expectation of privacy and the expectation must be one that society is prepared to accept as reasonable. (See *People* v. *Kosoff* (1973) 34 Cal.App.3d 920, 932 [110 Cal.Rptr. 391].) One cannot reasonably expect that a car imported into the United States would not be

subject to customs search; no importer would reasonably believe that he could avoid examination or inspection of goods by customs officials. (*People* v. *Kosoff* (1973) 34 Cal.App.3d 920, 931 [110 Cal.Rptr. 391].) Further, it was a reasonable expectation that the odor of eight pounds of marijuana would emanate from the car despite the addition of the aluminum piece inserted in the frame and the welded plate.

Based on Humphrey's alert to the Maserati, it was entirely reasonable for Inspector LaFata, an inspector trained to interdict narcotics, to suspect that the Maserati contained contraband narcotics. Although drilling the two or three one-eighth-inch holes was a search of intrusive nature, it was minimal and fully justified by the circumstances. ■ We conclude that it was not a prohibited search under the Fourth Amendment. The substance on the end of the drill bit appeared to LaFata to be hashish; this was confirmed in two ways—by Humphrey's prior alert and by the in-the-field test. Thus he had reasonable cause to believe the Maserati contained narcotics. The customs house examination of the floorboard revealing an altered plate in the area of the odor and drilled holes justified the greater intrusion of removing the plate; and it is not in question here.

Inspector LaFata testified he no longer has the test ampule used by him in the field to test the substance on the drill bit. This was the basis of defendant's motion pursuant to *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]; it was denied. Appellant argues that LaFata made no effort to preserve the ampule or the drill bit, thus his testimony should have been excluded. We note that had he preserved the ampule, he could have produced only a deteriorated material in an unrecognizable state. ■ Where evidence has been destroyed, if the authorities acted in good faith, the defense will be called upon to make a showing of substantial materiality. Even after this showing is made, an appellate court will not reverse the conviction if the prosecution establishes that the evidence was harmless beyond a reasonable doubt. (*People* v. *Wright* (1976) 60 Cal.App.3d 6, 15-16 [131 Cal.Rptr. 311].) Immediately after removing the drill, Inspector LaFata took the residue on the bit and put it in a field kit (ampule); he no longer has the ampule used to make the test because the substance in it had deteriorated; he explained "there is acid in the kits and that deteriorates very fast after you use them"—the results deteriorated to an unrecognizable state. LaFata further testified that the inspectors cannot consider the field test as conclusive because they are not chemists so it is used

only as a tool to confirm an opinion that a substance is a narcotic; thus, as part of the procedure, they take a sample of the substance tested, and in this case he took a sample of the substance on the drill bit to the customs laboratory where a chemist ran a test.

■ There is no evidence of bad faith in the record before us, nor is there any showing that the contents of such ampule were of substantial materiality to defendant's case. First, the contents of the test ampule within a short time of the test deteriorated to an unrecognizable state. Second, the result of the field test was admittedly inconclusive and used only as a tool to confirm LaFata's already formed suspicion (based on Humphrey's alert and the appearance of the residue on the drill bit) that the substance was hashish. Third, the results of the field test were unnecessary to justify further search (beneath the floorboard) of the vehicle because Humphrey's alert and the substance on the drill bit which appeared to LaFata to be hashish were sufficient to justify a reasonable suspicion that the car contained contraband narcotics. Fourth, customs laboratory has a laboratory test of the remaining substance on the drill bit. The denial of the motion was proper.

At the customs house various pieces of hashish wrapped in cellophane were removed from the frame of the car, initialed and taken into custody by customs. At the same time Officer Cleveland (Customs Patrol) personally removed one piece of the contraband from the car frame, initialed it and returned it to the Maserati. The car was restored to its original condition and on January 3 a "controlled delivery" of a piece of hashish in the Maserati was made to defendant. The car was released to him at Long Beach; he drove it under surveillance of Officer Cleveland and Long Beach police to an address in Pasadena; he parked in the driveway and, after inspecting the interior of the vehicle and raising the rear seat, was arrested as he exited the vehicle. The only physical evidence seized as a result of the "controlled delivery" search was the single piece of hashish taken from the frame of the vehicle by Officer Cleveland.

At the outset we note that controlled deliveries are normally used in narcotic cases with judicial approval. ■ "[I]t has consistently been held that it is proper for the authorities to allow a package of known contraband to be delivered to its intended recipient, for the purpose of apprehending or investigating the importers of narcotics. [Citations.]" (*People* v. *Kosoff* (1973) 34 Cal.App.3d 920, 932 [110 Cal.Rptr. 391]

(see also cases collected at p. 933); *People* v. *Superior Court* (*Randall*) (1973) 33 Cal.App.3d 523, 527, fn. 3 [109 Cal.Rptr. 143].) Appellant's complaint is that "warrantless 'controlled delivery' customs searches are unlawful," citing *People* v. *Whyte* (1979) 90 Cal.App.3d 235 [152 Cal. Rptr. 280]. But there is no such holding in *Whyte*. There, customs officers delivered to and left several bales of burlap containing 43 pounds of marijuana on the sidewalk in front of a bookstore where defendant had a business, at the instruction of a clerk; they departed and because defendant was delayed in picking up the bales by truck, another clerk dragged them into the bookstore several hours later whereupon customs agents went into the bookstore and arrested the first clerk; the bales were returned to the sidewalk. During the day customs officials had kept the bookstore and defendant under surveillance; defendant once entered the bookstore, parked across the street watching it and several times drove past it; finally at 11:15 p.m. they took the bales into custody without a warrant. The court rejected the People's contention that this was a customs search. The court held the intrusion to be unreasonable and concluded that "Once the bales of burlap were placed inside the bookstore, control by the customs service ended." (P. 244.) The court said "While they [bales] were out on the sidewalk, under the surveillance of federal agents, it conceivably could be argued that they remained in transit and under the control of the customs service. However, once the bales were placed inside the Abraxas Book Store where respondent rented space for his business, and absent exigent circumstances, a warrantless seizure and subsequent search of the bales became unreasonable under any theory. [¶] Clearly, they were no longer in transit or under the dominion of customs." (P. 243.) *Whyte* is inapposite here for obvious reasons. Further, *Whyte* does not hold that warrantless controlled delivery customs searches are unlawful; the court did intimate that a customs search might have been involved had the bales been "in transit or under the dominion of customs," and the bales well might have been considered to be in transit and under the control of customs had they not been dragged into the bookstore.

The Maserati was still under the control of customs; defendant was arrested as he stepped out of the vehicle before he had an opportunity to remove the narcotics. We conclude that the removal of the single package of hashish from the Maserati by Officer Cleveland was the result of an extended border search. Nothing in the record indicates this search was unlawful.

Finally, appellant contends the trial court erred in admitting his statements to police because they were made after he was confronted with illegally obtained evidence. He relies upon *People* v. *DeVaughn* (1977) 18 Cal.3d 889 [135 Cal.Rptr. 786, 558 P.2d 872] for his contention "that after confrontations with illegally seized evidence and without a timely *Miranda* warning after an arrest without probable cause, any statement made by him is inadmissible." The fact is that if defendant was confronted with any evidence before his statements, that evidence had to be that recovered from the Maserati by Officer Cleveland which was not illegally seized; his statements were voluntarily made and were properly admitted. Officer Northrup testified that when defendant exited the driver's seat he placed him under arrest. No questions were asked but, upon being told for what offense he was being arrested, defendant spontaneously volunteered that the vehicle was his, the contraband in it was his and he would take full responsibility; Officer Northrup "just had him stop" talking and advised him of his constitutional rights; after waiving them defendant said the vehicle was his and he had imported it from England, placed the hashish in the car himself, came here for a road racing tour and the hashish was for his personal use.

The judgment is affirmed.

Hanson (Thaxton), J., concurred.

**DUNN (G. W.), J.*—**I dissent.

I

I respectfully dissent from the view of the majority for two reasons: First, the evidence adduced at the trial was not sufficient to establish that the search in this case took place at a border location or at its functional equivalent. Inasmuch as the prosecution did not meet its burden of proving this necessary prerequisite, the search was subject to the stringent Fourth Amendment requirement to obtain a search warrant prior to any search. Second, the dog was used to conduct an indiscriminate, exploratory search, which is invalid even at a border site.

Border searches were exempted from probable cause requirements by the First Congress of the United States,[1] and such searches are justified

---

*Assigned by the Chairperson of the Judicial Council.
[1]United States Statutes, chapter 5, 1 Statutes at Large 29, 43 (1789).

by the interest in national self-protection. (*Carroll* v. *United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790] (dictum); *United States* v. *Ramsey* (1977) 431 U.S. 606 [52 L.Ed.2d 617, 97 S.Ct. 1972] (dictum).) It is well settled, however, that border searches must take place at a border or at "the functional equivalent" thereof. (*Almeida-Sanchez* v. *United States* (1973) 413 U.S. 266, 273 [37 L.Ed.2d 596, 603, 93 S.Ct. 2535]; *United States* v. *Ivey* (5th Cir. 1977) 546 F.2d 139.) The test to determine whether a location meets the status of functional equivalency was developed as a result of a series of automobile searches at locations away from a border. Such searches constituted a substantial invasion of privacy and to protect that privacy from government arbitrariness the courts developed the functional equivalency standard.[2] In order to justify the validity of the warrantless search conducted in this case, it was incumbent upon the prosecution to present evidence sufficient to establish that the search site was a border location or its functional equivalent. Mere proximity of the site to the border does not alone, it must be emphasized, justify a search in the absence of probable cause. (*United States* v. *Storm* (5th Cir. 1973) 480 F.2d 701, 705.) The protections of the Fourth Amendment may not be relaxed in a geographical area merely because some nexus with the border has been established. (*United States* v. *Bowman* (5th Cir. 1974) 502 F.2d 1215; *United States* v. *Thompson* (5th Cir. 1973) 475 F.2d 1359; *People* v. *Duncan* (1974) 40 Cal.App.3d 940 [115 Cal.Rptr. 699].)

Three general characteristics determine whether or not a location qualifies for functional equivalency status: (1) the proximity of the checkpoint to the border; (2) the permanent nature of the checkpoint; and (3) its hours of operation. (*United States* v. *Hart* (5th Cir. 1975) 506 F.2d 887, 896; *United States* v. *Calvillo* (5th Cir. 1976) 537 F.2d 158.) It is clear then, that the functional equivalency label is not one that may be arbitrarily bestowed. See *United States* v. *Calvillo, supra*, at page 160; *Almeida-Sanchez* v. *United States, supra*, 413 U.S. 266, at page 269 [37 L.Ed.2d 596 at pages 600-601].

A thorough perusal of the transcript of the trial proceedings in the case at hand reveals no evidence from which one can reasonably conclude that the Pasha car lot constituted a part of the border area or, in

---

[2]See *Almeida-Sanchez* v. *United States, supra*, 413 U.S. 266, 273 [37 L.Ed.2d 596, 602-603]; *United States* v. *Anderson* (9th Cir. 1974) 509 F.2d 724; *United States* v. *Ortiz* (1975) 422 U.S. 891 [45 L.Ed.2d 623, 95 S.Ct. 2585]; *United States* v. *Alvarez-Gonzalez* (5th Cir. 1976) 542 F.2d 226.

the alternative, the functional equivalent of a border. The testimony on this issue, such as it is, was supplied by three witnesses one of whom was the customs inspector, LaFata. The dialogue between Officer LaFata, the Defense Attorney Williams and the prosecutor is illuminating on the issue of the lack of information as to the official status of the Pasha car lot:

"Q. Officer LaFata, as an inspector for the U.S. Customs Department, you are familiar with the Pasha Company lot, are you not?

"A. Yes.

"Q. Specifically Pier J, Berth 244, I believe it was?

"A. Yes.

"Q. That lot is private property, is it not sir?

"A. Yes, it is.

"Q. It is not quarantined property for U.S. Customs, is it?—(objections on the record)—

"A. To the best of my knowledge, no.

"Q. By Mr. Williams: There is no designation, to the best of your knowledge, as concerning that particular piece of property being isolated and under the control and jurisdiction of U.S. Customs, is it?—(objections on the record)—

"By Prosecutor Friedenberg: I would object to the form of the question as vague and uncertain, whether he means designation posted or designation within the records of the customs office.

"The Court: All right sustained.

"Q. By Mr. Williams: Officer LaFata, is there any postings contained around the property which designate it as isolated U.S. Customs property?

"A. On that particular property, none that I have seen, no.

"Q. Officer LaFata, have you been notified by any of your superiors or any other personnel in the customs department that that's—specific property is designated as a quarantine zone for the U.S. Customs?

"A. I am not sure I know what you mean by 'quarantine zone.' I think that is what is confusing me.

"Q. All right. Has anybody in U.S. Customs designated the Pasha Company lot as property that is under the exclusive jurisdiction of U.S. Customs?

"A. As far as exclusive jurisdiction, I don't know. We have—we have a section in customs that's called cargo security, and when companies apply to have imported cargo sit there, their lots have to be approved, fencing, supposedly guard or some sort of security system that would allow them—I believe they have to post some sort of bond also when they apply for this thing. Now, if there is what you mean by customs jurisdiction, yes. I agree that it has been an approved lot for customs jurisdiction, yes. I agree that it has been an approved lot for customs jurisdiction for the importation of these cars.

"Q. It has been an approved lot?

"A. To the best of my knowledge, yes. I am not that cargo security officer, so I don't know."

The testimony of Customs Patrol Officer Cleveland on the issue of the status of the Pasha car terminal was equally unenlightening:

"Q. Pasha Company lot, are you familiar with that area?

"A. Yes, I am.

"Q. Have you ever been called upon to go over there and conduct searches?

"A. Called upon. We do them routinely.

"Q. Through the Pasha Company lot?

"A. Yes.

"Q. Is that private property?

"A. Yes, it is.

"Q. Is it quarantined?

"A. It is a bonded area. It is a customs security area. It is under the auspices of customs.

"Q. What do you mean by that?

"A. It exists as a terminal with the graces of customs. Okay. It is—they have to comply with customs regulations and, you know, be available to customs, you know, for customs security reasons."

This specific testimony and other similar testimony is insufficient in my view to establish the Pasha Company lot as a part of the border point of entry. In fact, a "terminal" which exists "with the graces of customs" would more likely appear to fall into the "functional equivalent of a border" status. But, in that event, the evidence falls short in that there is nothing to establish either the permanency of the location as an established checkpoint or its hours of operation.

It seems clear that these sparse facts supplied by the prosecution on the issue of the legal status of the Pasha lot are insufficient to carry its burden of proof that the search and seizure complained of herein occurred at a border location or at a location which is the functional equivalent of the border. The car lot is strategically or reasonably a good site for customs search purposes, however, on the basis of the present record, the search at this location cannot in my judgment be insulated from the probable cause requirement of the Fourth Amendment. (See *United States* v. *Storm, supra,* 480 F.2d 701, 705; *United States* v. *Ortiz, supra,* 422 U.S. 891; *United States* v. *Alvarez-Gonzalez, supra,* 542 F.2d 226; *United States* v. *Calvillo, supra,* 537 F.2d 158; *Almeida-Sanchez* v. *United States, supra,* 413 U.S. 266, 273 [37 L.Ed.2d 596, 602-603]; *United States* v. *Martinez* (5th Cir. 1976) 526 F.2d 954; *United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873 [45 L.Ed.2d 607, 95 S.Ct. 2574].)

Although it is true that the nation's perimeters are expandable for purposes of a border search whether under the auspices of the customs

authority or the immigration authority, it is incumbent upon the prosecution to prove, rather than leave to inference, that the area in which a search occurs, meets border status criteria. (See *Marsh* v. *United States* (5th Cir. 1965) 344 F.2d 317, 325; and *United States* v. *McDaniel* (5th Cir. 1972) 463 F.2d 129, 133, cert. den. 413 U.S. 919 [37 L.Ed.2d 1041, 93 S.Ct. 3046].) Were it otherwise, searches on less than reasonable cause would be permissible at any location within close proximity to any national frontier.

## II

Although it is generally recognized that the borders are elastic and the right to search at the border is almost unfettered, the Fourth Amendment requirement of reasonableness is not emasculated. (See *United States* v. *Yee Ngee How* (N.D.Cal. 1952) 105 F.Supp. 517, 519.) Although for border searches we may "stretch the usual Fourth Amendment standard of probable cause," *United States* v. *McDaniel, supra*, 463 F.2d 129, 133; cert. den. 413 U.S. 919, by requiring that warrantless searches be based upon "reasonable" rather than "probable" cause, customs officers may not engage in promiscuous searches. The facts adduced in this case establish that a prohibited promiscuous search occurred.

The search and seizure of which appellant complains occurred as a result of the olfactory prowess of a canine named Humphrey. Humphrey, on December 26, 1978, was taken by James McCauley, who was employed as a detector dog handler by the United States Customs Service to the Pasha car lot on Pier J in Long Beach, California. Humphrey had been trained to use his keen sense of smell to detect the odor of marijuana and hashish. The Pasha lot is a location near the Long Beach port at which cars imported into the United States are stored. It is privately owned property secured by a chain link fence. Without a search warrant and without any specific reason to suspect the presence of any drug contraband, Mr. McCauley had Humphrey sniff each of the 66 cars in the compound for the purpose of detecting any drug contraband present. At the 66th car, a 1970 Maserati, Humphrey "alerted" by scratching and biting at the underside of the car. Mr. McCauley immediately contacted Customs Inspector Officer Joe LaFata.

The two men and Humphrey again approached the Maserati and Humphrey again alerted. Officer LaFata at this point drilled one or two

one-eighth-inch holes into the frame of the car. Thereafter, he conducted a field test on a brown substance which adhered to the drill, obtaining a "positive" result for the substance tetrahydrocannibinol, which is ordinarily present in marijuana and hashish. The ampoule used to conduct the test was discarded. The vehicle was then transported to the public stores area of the Terminal Island Customs House, where the interior of the car was searched and, subsequently, a floor plate was removed from beneath the rear seat and eight pounds of hashish was exposed in a compartment.

No search warrant was ever issued or applied for. Defendant's motion to suppress the evidence procured was denied.

These facts reveal that not one, but three searches occurred without the prior procurement of a search warrant. First, the olfactory excursion of Humphrey did, in my view, constitute a search which was exploratory in nature. In accord is *People* v. *Evans* (1977) 65 Cal.App.3d 924 [134 Cal.Rptr. 436], a case factually similar to the instant case. Federal agents in the *Evans* case, acting without antecedent information that marijuana was at a miniwarehouse location and without a search warrant used detector dogs to sniff out the location of marijuana. The court held that: "...such a search with canines conducted without some preknowledge or reasonably strong suspicion that contraband is to be found in a particular location is a constitutionally impermissible invasion of the suspects' reasonable expectations of privacy and consequently a violation of the Fourth Amendment." (At p. 933.) Similarly in *People* v. *Williams* (1975) 51 Cal.App.3d 346 [124 Cal.Rptr. 253], the court held that the activities of two sheriffs at an airline terminal constituted an unreasonable, exploratory search. Acting without a search warrant and without notice or knowledge of the possible presence of narcotics the two sheriffs had the detector dog, Bourbon, sniff miscellaneous baggage at the baggage staging area where they had no permission to be. When the dog gave an alert indicating to them the presence of marijuana, they opened the baggage and then identified and arrested the owner. The court did not make clear, however, whether the impermissible conduct was the sniffing rather than the warrantless intrusion into the baggage without reasonable cause other than Bourbon.

The case of *United States* v. *Solis* (9th Cir. 1976) 536 F.2d 880, in which the court held that the use of detector dogs constituted a reasonable search is clearly distinguishable from the instant case. In *Solis*,

government agents used detector dogs Blue and Baron to sniff the air around the trailer. However, the officers were directed to this specific trailer by information to the effect that a white semitrailer with a white paper license plate parked at a specific gas station contained marijuana. The holding of the Court of Appeal that the use of the dogs in this situation was reasonable articulated recognition that the investigation was not indiscriminate but solely directed toward particular contraband. (At p. 882.) *United States* v. *Bronstein* (2d Cir. 1975) 521 F.2d 459, 461-463, cert. den. 424 U.S. 918, [47 L.Ed.2d 324, 96 S.Ct. 1121], *United States* v. *Venema* (10th Cir. 1977) 563 F.2d 1003, 1005, 1007, and *United States* v. *Fulero* (D.C. Cir. 1974) 498 F.2d 748, 749, likewise, were cases in which law enforcement officers acted upon specific prior information and concentrated upon a specific objective suspected of containing contraband. They were not exploratory searches as in the instant case.

The majority opinion relies in part upon the authority of *United States* v. *Race* (1st Cir. 1976) 529 F.2d 12, inasmuch as it was, unlike *Bronstein, Venema* and *Fulero,* a port of entry case. In *Race,* an expert dog handler using a detector dog made an exploratory search of 300 crates at the American Airlines warehouse located at Logan Airport. Subsequent to the dog's alert at two crates, the agent inserted a knife into one of the crates and detected the odor of marijuana on the knife blade. The consignee of the crates, having identified himself, was approached regarding consent to search the crates, which he was held to have given. The search after consent uncoverd marijuana. The appellate court in *Race* specifically did not decide if the use of the knife was a prohibited search. "... Even assuming that [agent] Murphy violated the fourth amendment by inserting the knife into one of the crates, *a question we do not decide,* we do not think exclusion of the marijuana in the crates would be warranted." (Italics added) (At p. 15.) The court reasoned that the search of the crates after consent was given by the consignee was not an exploitation of the original inspection and the consent "purged the primary taint" prohibited by *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].

With the above cited authorities and their rationale in mind, it is clear that in the instant case the use by the United States Customs employees of the dogs to sniff the air surrounding the 1970 Maserati in order to ferret out the presence of drugs, constituted a search within the meaning of the Fourth Amendment. It is noted that a number of courts have disposed of the issue of dog sniffing activity without any serious

consideration of whether the use of dogs constitutes a search. (See, *United States* v. *Race, supra*, 529 F.2d 12; *United States* v. *Fulero, supra*, 498 F.2d 748; *People* v. *Furman* (1973) 30 Cal.App.3d 454 [106 Cal.Rptr. 366]; and *People* v. *Lester* (1980) 101 Cal.App.3d 613 [161 Cal.Rptr. 703].) For cases which have considered the issue and held canine sniffing is not a search, see *United States* v. *Venema, supra*, 563 F.2d 1003, *United States* v. *Bronstein, supra*, 521 F.2d 459, cert. den. 424 U.S. 918, and *Doe* v. *Renfrow* (N.D. Ind. 1979) 475 F.Supp. 1012 (involving the search of persons).

What, after all, is a search? A search has been defined as "a governmental intrusion into an area in which a person has a reasonable expectation of privacy." (*Terry* v. *Ohio* (1968) 392 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612].) Indeed, the United States Supreme Court in *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], has established that the fundamental element protected by the Fourth Amendment is the reasonable expectation of privacy to which each person is entitled. (See also, *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727].)

In this case the customs officers utilized Humphrey as an exploratory probe in pursuit of their quest to penetrate and scrutinize an area concealed from human visual or olfactory detection. In the truest sense they were searchers. Both the dog and its handler were employed by United States customs to subject the air surrounding all of the vehicles to thorough inspection in order to detect and trace particularly identifiable molecules so as to discover, without specific prior reason to expect the presence of, certain articles of contraband.

In order that the expectations of privacy in the instant case be considered reduced to those of travelers whose baggage is subject to careful scrutiny at an airport or border port of entry, it was first essential to establish that the car lot upon which the vehicle involved herein was stored, was, in fact, a border area. Clearly, herein, without such showing that the probable cause requirements of the Fourth Amendment were relaxed, the use of the sensitive, finely trained nose of the dog was an intrusion upon the owner's reasonable expectation of privacy and constituted the use of an "uninvited proboscis" to search, just as the use of an electronic monitoring device outside of a telephone booth was held in *Katz* to constitute a search by an uninvited electronic ear. (*Katz* v. *United States, supra*, 389 U.S. 347, at p. 352 [19 L.Ed.2d 576, at p. 582].)

## III

The second search occurred when holes were drilled in the frame of the Maserati. The majority views this act as an intrusion minimal in nature and, therefore, reasonable. The majority then postulate that the minimal intrusion of drilling holes resulting in a positive field test provided a reasonable basis upon which to conduct the more intrusive third search which followed by which the car was entered and floor plates removed. It cannot be reasonably argued that the act of drilling holes in the vehicle did not constitute a search within the contemplation of search and seizure protections of the federal and California Constitutions. (See *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602 [21 Cal. Rptr. 552, 371 P.2d 288] (uncapping a pipe to view a toilet); *People* v. *Ruiz* (1956) 146 Cal.App.2d 630 [304 P.2d 175] (drilling a hole); *People* v. *Regalado* (1964) 224 Cal.App.2d 586 [36 Cal.Rptr. 795] (boring holes in hotel doors); and *Britt* v. *Superior Court* (1962) 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817] (vents into toilets).) How can it ever make sense that a search which is prohibited is made permissible by a "minimal intrusion" which uncovers contraband? The minimal intrusion itself constitutes an invasion of the sphere of privacy expected to be immune from such invasion.

## IV

The contention that a customs agent needs no warrant and no probable cause to search at a border site or its functional equivalent is correct. The implication that a general, routine exploratory search is permissible, however, is grossly erroneous. The authority for customs seizures is found in section 482 of title 19 of the United States Code[3] (*United States* v. *Diamond* (9th Cir. 1973) 471 F.2d 771, cert. den. 412 U.S. 932 [37 L.Ed.2d 161, 93 S.Ct. 2751]), and requires that customs agents must be possessed of objective facts which form a basis for a reasonable suspicion that customs laws are being violated before they may properly make a search. (*United States* v. *Ramsey, supra*, 431 U.S. 606; *United States* v. *Diemler* (5th Cir. 1974) 498 F.2d 1070; and *United States* v. *Daly* (5th Cir. 1974) 493 F.2d 395.) The reasonable suspicion must not be merely of any violation, but must be of a customs or immigration violation. (*United States* v. *Diemler, supra*; *United States* v. *McDaniel, supra*, 463 F.2d 129, 133, cert. den. 413 U.S. 919.)

---

[3]Section 482 provides: "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective dis-

In summary, the searches in the instant case occurred at a location which has not been shown by evidence to qualify for border status or its functional equivalent, therefore it was necessary that the customs employees meet the standards of reasonableness mandated by the Fourth Amendment. Unless exigent circumstances were present it was mandated that a search warrant be obtained prior to any search. (*Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975].) The record in this case reflects that the Maserati was on property that was fenced and not generally open to public access. The vehicle could not, therefore, have been spirited away before the customs officers could obtain a warrant. This situation is drastically different from a vehicle on a public highway and from airport situations where people and baggage are constantly on the move.

The prerequisite of a judicial search warrant has been established to assure that a dispassionate determination is made regarding whether there is sufficient evidence to justify a search, and to define the scope of the search. Intrusions without a warrant which constitute a search such as occurred here are illegal unless they fall within certain narrowly defined exceptions. One of the exceptions includes searches made upon reasonable cause where the circumstances are such that the procurement of a search warrant would be impractical. The prosecution has made no such showing and has relied solely upon the assertion that this search fell within the border search exception to the Fourth Amendment requirements. Inasmuch as Mr. McCauley was randomly seeking to discover any contraband which may have been present and since his attention was not focused upon any particular vehicle for any specific reason, the warrantless search was unreasonable and therefore illegal. All evidence procured by the prosecution was the direct fruit of the knowledge gained by reason of that illegality and should, therefore, have been suppressed. (*Wong Sun* v. *United States, supra*, 371 U.S. 471, 484 [9 L.Ed.2d 441, 453]; *People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713].)

tricts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

Although we must be zealous in securing our borders against harmful importations, we must be equally zealous in protecting against harmful internal incursions upon Fourth Amendment principles. The case of *Doe* v. *Renfrow, supra*, 475 F.Supp. 1012, in which students in school were subjected to the promiscuous search of a sniffing dog walking up aisles and the nude search of a student based upon a dog's continued alert, is graphic example of the excesses against which we must guard.

The judgment should be reversed with directions to dismiss the action.