**Robert HORTON, as next friend of Robby Horton, Heather Horton and Sandra Sanchez, on their own behalf and on behalf of all others similarly situated, Plaintiffs-Appellants,**

v.

**GOOSE CREEK INDEPENDENT SCHOOL DISTRICT, Defendant-Appellee.**

No. 81–2215.

United States Court of Appeals, Fifth Circuit.

Nov. 1, 1982.
Opinion on Denial of Rehearing En Banc
Dec. 14, 1982.
See 693 F.2d 524.

---

1. As appellant sought to do here by a motion to amend that was denied.

2. Miss.Code Ann. § 15–1–35.

Arthur Val Perkins, Stefan Presser, Houston, Tex., for plaintiffs-appellants.

Richard A. Peebles, Baytown, Tex., for defendant-appellee.

ON PETITION FOR REHEARING

Before WISDOM, RANDALL and TATE, Circuit Judges.

PER CURIAM:

The defendant's petition for panel rehearing is granted, the opinion originally published (677 F.2d 471) in this case is withdrawn, and the following opinion is substituted therefor.

This case presents a question of first impression in this circuit: as a matter of constitutional law, can a school district, acting in good faith in an effort to deal with a serious drug and alcohol problem, subject students, their lockers, and their automobiles to the exploratory sniffing of dogs trained to detect certain contraband? We must consider the special circumstances peculiar to the public school environment, the duty of school officials to protect the minors in their care, the growing problem of drug and alcohol abuse in the schools, the students' interest in the integrity of their persons and effects, and the importance of demonstrating to the young that constitutional guarantees are not only lofty theories but do in practice control our government. Bearing in mind all these considerations, we hold that the dogs' sniffing of cars and lockers does not constitute a search within the purview of the fourth amendment. We hold further that the dogs' sniffing of the childrens' persons does constitute a search within the purview of the fourth amendment, and that in a school setting, individualized reasonable suspicion is required in order for the sniffing to be constitutional.

I. PROCEDURAL AND FACTUAL BACKGROUND.

The named plaintiffs, Robby Horton, Heather Horton, and Sandra Sanchez, brought this action by their next friend,

Robert Horton, seeking to represent all students enrolled in the Goose Creek Consolidated Independent School District (GCISD) in a challenge under 42 U.S.C. § 1983 to the defendant school district's canine drug detection program.

The defendant, GCISD, adopted the challenged program in response to a growing drug and alcohol abuse problem in the schools. It contracted with a security services firm, Securities Associates International, Inc. (SAI), that provides dogs (generally Doberman pinschers and German shepherds) trained to alert their handlers to the presence of any one of approximately sixty different substances, including alcohol and drugs, both over-the-counter and controlled. The defendant conducted assemblies in the elementary schools to acquaint the children with the dogs and informed students in the junior and senior high schools of the program. On a random and unannounced basis, the dogs are taken to the various schools in the district, where they sniff students' lockers and automobiles. They also go into the classrooms, on leashes, to sniff the students themselves. During their "playtime" at the schools, the dogs are sometimes taken off their leashes. When a dog alerts the handler to the odor of an illicit substance on a student's person, after the sweep of the class is completed and the dog and handler have departed, a school official discreetly asks the student to leave the class and go to the administrator's office, where he is subjected to a search of pockets, purse, and outer garments.[1] When a dog alerts his handler to an automobile, the student driver is asked to open the doors and the trunk. If he refuses, the school notifies the parents. When a dog alerts his handler to a locker, the school searches the locker without the consent of the student to whom it is assigned. If the student is found to possess substances that violate school policy, he may agree to seek outside counseling; otherwise the administrator may recommend to the superintendent that the student be

suspended. Second-time violators do not have the option of counseling.

The named plaintiffs were all subjected to the sniffing of the canine drug detectors. Two of them, Robby Horton and Sandra Sanchez, triggered alerts. School officials questioned Sandra, took her purse, and searched it without her consent. They found a small bottle of perfume, which they returned to her. Robby was asked to empty his pockets, which he did. When nothing incriminating was found, the school officials searched his socks and lower pants legs but again found no contraband.[2]

The plaintiffs brought this action, alleging a violation of the fourth amendment prohibition of unreasonable searches and seizures and a violation of the fourteenth amendment prohibition of deprivations of liberty and property without due process. On a motion for class certification and cross-motions for summary judgment, the district court denied certification and held that the sniffing, although it is a search, is not unreasonable. Further, it held that reasonable cause is the standard for searches of students and their property by school officials acting in loco parentis, and the alert of the dogs provides reasonable cause for searches of lockers and cars as well as for searches of the pockets, purses, and outer garments of students. Finally, the district court held that the program does not violate the due process clause, because it subjects the students to minimal intrusion, humiliation, and fear. The plaintiffs appeal both on the merits and on the question of class certification.

## II. THE CONSTITUTIONALITY OF THE DOG SNIFFING.

Although the specific problem presented in this case is new to the Fifth Circuit, a district court in this circuit and appellate courts for the Seventh and Tenth Circuits have decided similar cases. In the most recent case, Zamora v. Pomeroy, 639 F.2d

---

1. The parties agree that no such intrusive searches as strip searches or body cavity searches occur.

2. We use "contraband" to refer to all substances that the school forbids students to possess, even if possession violates no law.

662 (10th Cir. 1981), the Tenth Circuit upheld the use of dogs in exploratory sniffing of lockers. Although the focus of the opinion was the due process problem presented by the school's disciplinary action, the court did consider the fourth amendment issues. Noting that the school gave notice at the beginning of each school year that lockers were subject to being opened and that the school and the student possessed the locker jointly, the court held that the school administrator's duty to maintain an educational atmosphere in the school necessitated a reasonable right of inspection, even though the inspection might infringe a student's rights under the fourth amendment. *Id.* at 670.

The Seventh Circuit reached the same result on facts similar to those presented by the GCISD program. In *Doe v. Renfrow*, 475 F.Supp. 1012 (N.D.Ind.1979), *op. adopted on this issue and rev'd on another issue*, 631 F.2d 91 (7th Cir.) (per curiam), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981), the school, with the assistance of the police, used dogs for general, exploratory sniffing of students. The court held that the sniff of a dog is not a search, particularly in view of the diminished expectations of privacy inherent in a public school, the school's right and duty *in loco parentis* to supervise students and maintain an educationally sound environment, and the minimal intrusion involved.

A district court in our own circuit, on the other hand, reached the opposite result, explicitly rejecting *Doe v. Renfrow*. *Jones v. Latexo Independent School District*, 499 F.Supp. 223, 236 (E.D.Tex.1980). The Latexo Independent School District used dogs to sniff both students and automobiles. The court granted a preliminary injunction against the sniffing. In its view, the school environment was a factor to be considered, but it did not automatically outweigh all other factors. The absence of individualized suspicion, the use of large animals

trained to attack, the detection of odors outside the range of the human sense of smell, and the intrusiveness of a search of the students' persons combined to convince the judge that the sniffing of the students was not reasonable. Since the students had no access to their cars during the school day, the school's interest in the sniffing of cars was minimal, and the court concluded that the sniffing of the cars was also unreasonable. The result in *Jones* appears to be that favored by the commentators, who have been unanimous in their criticism of *Doe v. Renfrow. See, e.g.*, Gardner, *Sniffing for Drugs in the Classroom—Perspectives on Fourth Amendment Scope*, 74 Nw. U.L.Rev. 803 (1980); Note, *The Constitutionality of Canine Searches in the Classroom*, 71 J.Crim.L. & Criminology 39 (1980); Comment, *Search and Seizure in Public Schools: Are Our Children's Rights Going to the Dogs?* 24 St. Louis U.L.J. 119, 131–33 (1979); *see also Doe v. Renfrow*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (Brennan, J., dissenting from denial of certiorari); *Doe v. Renfrow*, 631 F.2d 91, 93 (7th Cir. 1980) (Swygert, J., dissenting from denial of rehearing). It is against the background of this split in authority that we undertake our own analysis of the question.

The problem presented in this case is the convergence of two troubling questions. First, is the sniff of a drug-detecting dog a "search" within the purview of the fourth amendment? Second, to what extent does the fourth amendment protect students against searches by school administrators seeking to maintain a safe environment conducive to education? On each question, we find an abundance of precedent but scant guidance.

### A. The Canine Sniff as a Search.

Frequent use of drug-detecting dogs by law enforcement officials has led to a great number of cases challenging the admissibility of the fruits of a canine sniff.[3] From

---

**3.** The following list is not exhaustive. *United States v. Johnson*, 660 F.2d 21 (2nd Cir. 1981); *United States v. Viera*, 644 F.2d 509 (5th Cir.), *cert. denied*, 454 U.S. 867, 102 S.Ct. 332, 70

L.Ed.2d 169 (1981); *United States v. Goldstein*, 635 F.2d 356 (5th Cir.), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981); *United States v. Sullivan*, 625 F.2d 9 (4th Cir.

these cases, one proposition is clear and universally accepted: if the police have some basis for suspecting an individual of possessing contraband, they may, consonant with the fourth amendment, use a drug-detecting dog to sniff checked luggage,[4] shipped packages,[5] storage lockers,[6] trailers,[7] or cars.[8] While the rationales of these cases are not the same, the majority view is that the sniffing of objects by a dog is not a search. *See, e.g., United States v. Waltzer,* 682 F.2d 370 (2d Cir. 1982); *United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976); *United States v. Fulero,* 498 F.2d 748 (D.C.Cir.1974). *But see, e.g., People v. Williams,* 51 Cal.App.3d 346, 124 Cal.Rptr. 253 (1975); *cf. People v. Campbell,* 67 Ill.2d 308, 10 Ill.Dec. 340, 367 N.E.2d 949, *cert. denied,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978) (characterization as "search" is not significant; the question is whether the investigation is rea-

sonable).[9] Only the Ninth Circuit has held that the sniffing of objects is a search, though it may at times be reasonable. *United States v. Beale,* 674 F.2d 1327 (9th Cir. 1982); *United States v. Solis,* 536 F.2d 880 (9th Cir. 1976).

The decision to characterize an action as a search is in essence a conclusion about whether the fourth amendment applies at all. If an activity is not a search or seizure (assuming the activity does not violate some other constitutional or statutory provision), then the government enjoys a virtual carte blanche to do as it pleases. The activity is "excluded from judicial control and the command of reasonableness." Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 393 (1974). We must analyze the question of whether dog sniffing is a search in terms of whether the sniffing offends reasonable expectations of privacy, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and must look at

1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352 (1981); *United States v. Klein,* 626 F.2d 22 (7th Cir. 1980); *United States v. Burns,* 624 F.2d 95 (10th Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980); ·*United States v. Venema,* 563 F.2d 1003 (10th Cir. 1977); *United States v. Solis,* 536 F.2d 880 (9th Cir. 1976); *United States v. Race,* 529 F.2d 12, 14 n.2 (1st Cir. 1976); *United States v. Bronstein,* 521 F.2d 459 (2nd Cir. 1975); *United States v. Fulero,* 498 F.2d 748 (D.C.Cir.1974) (per curiam); *State v. Morrow,* 128 Ariz. 309, 625 P.2d 898 (1981); *State v. Martinez,* 113 Ariz. 345, 554 P.2d 1272 (1976) (adopting opinion published at 26 Ariz.App. 210, 547 P.2d 62); *State v. Quatsling,* 24 Ariz. App. 105, 536 P.2d 226 (1975), *cert. denied,* 424 U.S. 945, 96 S.Ct. 1416, 47 L.Ed.2d 352 (1976); *People v. Mayberry,* 117 Cal.App.3d 360, 172 Cal.Rptr. 629 (1981), *superseded,* 31 Cal.3d 335, 182 Cal.Rptr. 617, 644 P.2d 810 (1982); *People v. Denman,* 112 Cal.App.3d 1003, 169 Cal.Rptr. 742 (1980); *People v. St. George Matthews,* 112 Cal.App.3d 11, 169 Cal.Rptr. 263 (1980); *People v. Nagdeman,* 110 Cal.App.3d 404, 168 Cal. Rptr. 16 (1980); *People v. Evans,* 65 Cal. App.3d 924, 134 Cal.Rptr. 436 (1977); *People v. Williams,* 51 Cal.App.3d 346, 124 Cal.Rptr. 253 (1975); *State v. Mosier,* 392 So.2d 602 (Fla. App.1981); *State v. Goodley,* 381 So.2d 1180 (Fla.App.1980); *Mata v. State,* 380 So.2d 1157 (Fla.App.) (per curiam), *petition for review denied,* 389 So.2d 1112 (Fla.1980); *People v. Campbell,* 67 Ill.2d 308, 10 Ill.Dec. 340, 367 N.E.2d 949 (1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978); *People v.*

*Price,* 54 N.Y.2d 557, 446 N.Y.S.2d 906, 431 N.E.2d 267 (1981); *State v. Rogers,* 43 N.C. App. 475, 259 S.E.2d 572 (1979); *State v. Elkins,* 47 Ohio App.2d 307, 354 N.E.2d 716 (1976); *State v. Wolohan,* 23 Wash.App. 813, 598 P.2d 421 (1979).

4. *See, e.g., Goldstein, supra; Sullivan, supra; Bronstein, supra; Denman, supra.*

5. *State v. Elkins,* 47 Ohio App.2d 307, 354 N.E.2d 716 (1976).

6. *United States v. Venema,* 563 F.2d 1003 (10th Cir. 1977); *State v. Quatsling,* 24 Ariz.App. 105, 536 P.2d 226 (1975), *cert. denied,* 424 U.S. 945, 96 S.Ct. 1416, ·47 L.Ed.2d 352 (1976).

7. *United States v. Solis,* 536 F.2d 880 (9th Cir. 1976).

8. *State v. Martinez,* 26 Ariz.App. 210, 547 P.2d 62, *op. adopted,* 113 Ariz. 345, 554 P.2d 1272 (1976).

9. In reaching that conclusion, however, many of the leading cases explicitly rely on the existence of some basis for suspicion less than probable cause, before the police brought in their canine assistants. *See, e.g., Bronstein* at 463, 465 (Mansfield J., concurring); *Sullivan, supra* at 11–12; *United States v. Klein,* 626 F.2d 22 (7th Cir. 1980) ("This is not a case in which we need confront the thorny problem of an indiscriminate, dragnet-type sniffing expedition.").

the degree of intrusiveness of the challenged action to determine whether it is the type of activity that can be tolerated in a free society. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also* 1 W. LaFave, *Search and Seizure* § 2.2(a), at 234 (1978).

We have already held that the sniffing by dogs of luggage checked in an airport, *United States v. Goldstein,* 635 F.2d 356 (5th Cir.), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981), and luggage checked in a bus terminal, *United States v. Viera,* 644 F.2d 509 (5th Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981), is not a search, reasoning that "the passenger's reasonable expectation of privacy does not extend to the airspace surrounding that luggage." 635 F.2d at 361. We noted that the appellants had released their bags to the custody of the airlines, thereby relinquishing—at least temporarily—all control over them. Other circuits have emphasized the minimal humiliation entailed in dogs sniffing unattended luggage. *E.g., Bronstein, supra.*[10]

The courts have in effect adopted a doctrine of "public smell" analogous to the exclusion from fourth amendment coverage of things exposed to the public "view." *Katz, supra. See also United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (implicit); *United States v. Rivera,* 595 F.2d 1095, 1098–99 (5th Cir. 1979) (implicit); *see generally* 1 W. LaFave, *Search and Seizure* § 2.2(a) (1978). The courts have reasoned that if a police officer, positioned in a place where he has a right to be, is conscious of an odor, say, of marijuana, no search has occurred; the aroma emanating from the property or person is considered exposed to the public "view" and, therefore, unprotected. From this proposi-

tion the courts have concluded that the sniffing of a dog is "no different,"[11] or that the dog's olfactory sense merely "enhances" that of the police officer in the same way that a flashlight enhances the officer's sight.[12]

We find *Goldstein* to be controlling on the question of whether the dogs' sniffing of student lockers in public hallways and automobiles parked on public parking lots was a search. The sniffs occurred while the objects were unattended and positioned in public view. Had the principal of the school wandered past the lockers and smelled the pungent aroma of marijuana wafting through the corridors, it would be difficult to contend that a search had occurred. *Goldstein* stands for the proposition that the use of the dogs' nose to ferret out the scent from inanimate objects in public places is not treated any differently. We hold accordingly that the sniffs of the lockers and cars[13] did not constitute a search and therefore we need make no inquiry into the reasonableness of the sniffing of the lockers and automobiles.

The use of the dogs to sniff the students, however, presents an entirely different problem. After all, the fourth amendment "protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Neither *Goldstein* nor *Viera* involved sniffs of persons and therefore they are not controlling. The Second and Ninth Circuits specifically noted that people had not been sniffed when they upheld the constitutionality of dogs sniffing objects. *Bronstein, supra; Solis, supra.* The Seventh Circuit is the only circuit to have held that sniffs of school children do not constitute a search, *Renfrow, supra.* We note that there was apparently no evi-

10. All the cases cited in note 3, with the exception of *Burns,* involved unattended property. *Burns* involved a sniffing investigation incident to a valid arrest, so the evidence was admissible regardless of whether the sniffing qualified as a search. Thus the decided cases do not govern the sniffing of attended property or of persons.

11. *See, e.g., Goldstein; Bronstein.*

12. *See, e.g., Bronstein, supra* at 462 & n.3.

13. If anything, one's expectation of privacy in a car is lower than in one's luggage. *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion), *quoted in United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

dence in *Renfrow* that the dogs actually touched the students, while the dogs in the GCISD program put their noses right up against the children's bodies. Furthermore, as was noted above, the *Renfrow* decision has been universally criticized by the commentators.[14]

The students' persons certainly are not the subject of lowered expectations of privacy. On the contrary, society recognizes the interest in the integrity of one's person, and the fourth amendment applies with its fullest vigor against any intrusion on the human body. In fact, the Supreme Court has suggested that all governmental intrusions upon personal security are governed by the fourth amendment:

> In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness. Cf. *Brinegar v. United States,* 338 U.S. 160, 183 [69 S.Ct. 1302, 1314, 93 L.Ed. 1879] (1949) (Mr. Justice Jackson, dissenting). Compare *Camara v. Municipal Court,* 387 U.S. 523, 537 [87 S.Ct. 1727, 1735, 18 L.Ed.2d 930] (1967). This seems preferable to an approach which attributes too much significance to an overly technical definition of "search," and which turns in part upon a judge-made hierarchy of legislative enactments in the criminal sphere.

*Terry v. Ohio,* 392 U.S. 1, 18 n.15, 88 S.Ct. 1868, 1878 n.15, 20 L.Ed.2d 889 (1968). *See generally,* Gardner, *Sniffing for Drugs in the Classroom—Perspectives on Fourth Amendment Scope,* 74 Nw.U.L.Rev. 803, 848 (1980).[15]

The circuit courts have unanimously assumed that the use of magnetometers in airport terminals to detect concealed weapons, an activity far less intrusive than the use of large dogs to sniff the bodies of children, is a search. The Fourth Circuit originally held that the magnetometer walk-through

> is still a search. Indeed, that is the very purpose of the magnetometer: to search for metal and disclose its presence in areas where there is a normal expectation of privacy.

*United States v. Epperson,* 454 F.2d 769, 770 (4th Cir.), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972); *see also, United States v. Albarado,* 495 F.2d 799 (2d Cir. 1974); *United States v. Cyzewski,* 484 F.2d 509 (5th Cir. 1973); *United States v. Slocum,* 464 F.2d 1180 (3rd Cir. 1972); *United States v. Bell,* 464 F.2d 667 (2d Cir.), *cert. denied,* 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972).

The commentators agree that "the intensive smelling of people, even if done by dogs, [is] indecent and demeaning." 74 Nw. U.L.Rev. at 850; *see also* 71 J.Crim.L. & Criminology at 44. Most persons in our society deliberately attempt not to expose the odors emanating from their bodies to public smell. In contrast, where the Supreme Court has upheld limited investigations of body characteristics not justified by individualized suspicion, it has done so on the grounds that the particular characteristic was routinely exhibited to the public. *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (voice exemplars); *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (handwriting exemplars); *Davis v. Mississippi,*

---

14. Gardner, *Sniffing for Drugs in the Classroom—Perspectives on Fourth Amendment Scope,* 74 Nw.U.L.Rev. 803 (1980); Comment, *Search & Seizure in the Public Schools: Are Our Children's Rights Going to the Dogs?,* 24 St. Louis U.L.J. 119 (1979); Note, *The Constitutionality of Canine Searches in the Classroom,* 71 J.Crim.L. & Criminology 39 (1980).

15. *See also, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (upholding body-cavity searches of prisoners for security

reasons only by a bare 5–4 majority); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (upholding warrantless extraction of blood by a physician only because of the exigency of the circumstances); *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (holding that the forcible pumping of suspect's stomach violated due process clause of the fourteenth amendment because it "shocks the conscience").

394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (fingerprints). Intentional close proximity sniffing of the person is offensive whether the sniffer be canine or human. One can imagine the embarrassment which a young adolescent, already self-conscious about his or her body, might experience when a dog, being handled by a representative of the school administration, enters the classroom specifically for the purpose of sniffing the air around his or her person.

We need only look at the record in this case to see how a dog's sniffing technique— *i.e.,* sniffing around each child, putting his nose *on* the child and scratching and manifesting other signs of excitement in the case of an alert—is intrusive. The SAI representative explained that Doberman pinschers and German shepherds were used precisely because of the image maintained by the large dogs. Newman depo. at 16. Plaintiff, Heather Horton, described what happened when the dog entered the classrooms:

> Well, we were in the middle of a major French exam and the dog came in and walked up and down the aisles and stopped at every desk and sniffed on each side all around the people, the feet, the parts where you keep your books under the desk.

H. Horton depo. at 3. Ms. Horton went on to express her fear of the large dogs. *Id.* at 12. The SAI representative testified that the dogs put their noses "up against" the persons they are investigating. Newman depo. at 43.

On the basis of our examination of the record which indicates the degree of personal intrusiveness involved in this type of activity, we hold that sniffing by dogs of the students' persons in the manner involved in this case is a search within the purview of the fourth amendment. We need not decide today whether the use of dogs to sniff people in some other manner, e.g., at some distance, is a search.

Our decision that the sniffing is a search does not, however, compel the conclusion that it is constitutionally impermissible. The fourth amendment does not prohibit all searches; it only restricts the government to "reasonable" searches. The reasonableness of the procedure turns in this case on the school environment, to be discussed in Part II.B. But the reasonableness is also governed in part by general fourth amendment principles.

A dog's sniff of a person, particularly where the dogs actually touch the person as they do in the GCISD program, may be analogous to the warrantless "stop and frisk" upheld by the Supreme Court on the basis of a suspicion that fell short of probable cause. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Confronted with a choice between subjecting a useful and, indeed virtually indispensable, tool for both the protection of law enforcement officers and the prevention of crime to a requirement of probable cause and a warrant or of giving the police unbridled discretion to stop and frisk citizens, the Court rejected this monolithic, "all-or-nothing" view of the fourth amendment. Instead, it recognized a new category of search and seizure—the minimally intrusive stop and frisk—that could be conducted upon a finding of reasonable suspicion. Since the circumstances in which a stop and frisk is used preclude obtaining a warrant, the procedure is exempt from the warrant requirement.

The Court in effect adopted a balancing approach whereby the intrusiveness of the search is measured against society's need for the information. *See generally* 1 W. LaFave, *Search and Seizure* § 2.2(a), at 236 (1978). Similarly, the courts have upheld the warrantless use of magnetometers in light of their minimally intrusive character as weighed against the danger of skyjacking. *E.g., Cyzewski, supra.* Because the sniffing in this case occurred in a school environment, we need not address the question whether the sniffing of a person in a non-school setting is sufficiently intrusive to require the full panoply of fourth amendment protections—probable cause and a warrant—or whether such sniffing is less intrusive, requiring only reasonable suspicion. We leave that question for another day.

B. *The Fourth Amendment in the Public Schools.*

The courts have encountered substantial difficulty in accommodating the fourth amendment to the special situation presented by the public schools, where school officials have both a right and a duty to provide a safe environment conducive to education. At one time, it was not uncommon for a court to view the school official who searched a student as acting under authority derived from the parent and therefore as a private party not subject to the constraints of the fourth amendment. *See, e.g., Mercer v. State,* 450 S.W.2d 715 (Tex.Civ.App.—Austin 1970); *see generally* Buss, *The Fourth Amendment and Searches of Students in Public Schools,* 59 Iowa L.Rev. 739, 765–67 (1974); Comment, *Search and Seizure in Public Schools: Are Our Children's Rights Going to the Dogs?* 24 St. Louis U.L.J. 119, 127 (1979). As courts in most recent cases have decided, we think it beyond question that the school official, employed and paid by the state and supervising children who are, for the most part, compelled to attend,[16] is an agent of the government and is constrained by the fourth amendment. *Accord, Bellnier v. Lund,* 438 F.Supp. 47 (N.D.N.Y.1977); *State v. Baccino,* 282 A.2d 869 (Del.Super.1971); *State v. Young,* 234 Ga. 488, 216 S.E.2d 586, *cert. denied,* 423 U.S. 1039, 96 S.Ct. 576, 46 L.Ed.2d 413 (1975); *People v. Scott D.,* 34 N.Y.2d 483, 358 N.Y.S.2d 403, 315 N.E.2d 466 (1974). The Supreme Court's application to school officials of other constitutional restraints applicable only to state action compels that result. *See, e.g., Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

But the decision that school officials are governed by the fourth amendment does not dictate a holding that their activity in this case was unconstitutional. The basic concern of the fourth amendment is reasonableness,[17] and reasonableness depends on the circumstances. Often the ordinary requirements of the fourth amendment are modified to deal with special situations. *See, e.g., Terry, supra; Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (administrative search); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (same); *United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973) (airport search to prevent air piracy); *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir. 1967) (border search). The public school presents special circumstances that demand similar accommodations of the usual fourth amendment requirements. When society requires large groups of students, too young to be considered capable of mature restraint in their use of illegal substances or dangerous instrumentalities, it assumes a duty to protect them from dangers posed by anti-social activities—their own and those of other students—and to provide them with an environment in which education is possible. To fulfill that duty, teachers and school administrators must have broad supervisory and disciplinary powers.[18] At the same time,

---

**16.** Tex.Educ.Code Ann. § 21.032 (Vernon Supp. 1982). Given the public interest in encouraging noncompulsory secondary education and the social pressures to remain in school, as well as the difficulty of applying different standards to the 17- and 18-year-olds in the public school system, our discussion applies equally to those students not legally compelled to attend school.

**17.** *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968).

**18.** Courts usually refer to the basis of these powers as the *in loco parentis* doctrine. Under that doctrine, parents were viewed as ceding their parental powers over and duties to protect the best interests of a child to the school official, who then could act toward the child in any way that the parent could, exercising the same disciplinary and supervisory powers. Although the courts no longer view this doctrine as making the official effectively a private party, they still explain the broad powers of the school official as derived from his *in loco parentis* duties. We cannot accept this view. The law recognizes broad powers in a parent in part because one can safely assume that the parent will exercise those powers in the best

though, we must protect the fourth amendment rights of students. Indeed, constitutional rights in the schools take on a special importance. "That [the schools] are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette, supra* 319 U.S. at 637, 63 S.Ct. at 1185.

When the school official acts in furtherance of his duty to maintain a safe environment conducive to education,[19] the usual accommodation is to require that the school official have "reasonable cause" for his action. Although the standard is less stringent than that applicable to law enforcement officers, it requires more of the school official than good faith or minimal restraint. The Constitution does not permit good intentions to justify objectively outrageous intrusions on student privacy.[20] *See, e.g., Bellnier, supra; M. v. Board of Education,* 429 F.Supp. 288, 292 (S.D.Ill.1977); *Baccino, supra; Nelson v. State,* 319 So.2d 154 (Fla.App.1975). *See generally, Terry, supra. Contra, Young, supra.* Thus, though we do not question the good faith of

the GCISD officials in their attempt to eradicate a serious and menacing drug and alcohol abuse problem, we cannot approve the program on that basis; we must examine its objective reasonableness.

At least one case has held that the reasonable cause standard applicable in the schools requires individualized suspicion. *Bellnier, supra.* There, a teacher had reason to believe that someone in her class of fifth graders had stolen three dollars, but had no reason to suspect any particular pupil. When a search of the coats and coatroom revealed nothing, the teacher and principal required each pupil to remove his shoes and empty his pockets. The two officials then required each student to step into the washroom and strip to his undergarments. The court held the search unconstitutional, requiring the existence of facts giving the official reasonable particularized suspicions as a predicate for a search. *Accord, People v. Scott D.,* 34 N.Y.2d 483, 358 N.Y.S.2d 403, 315 N.E.2d 466 (1974) (dictum). The result in *Bellnier* is unquestionably correct, and we find its reasoning to be equally applicable to the canine sniffing of children. The intrusion on dignity and personal security that goes with the type of canine inspection of the student's person

interests of the child. The school administrator's duties, however, are not always exercised with only the child who is being disciplined or searched in mind. On the contrary, the school official must bear in mind the interests of all the students committed to his supervision and frequently actions toward one child will be taken to protect other children from him. To that extent, it no longer makes sense to view the school official as the equivalent of a parent. *See generally, Mercer v. State, supra* at 720–21 (Hughes, J., dissenting); 59 Iowa L.Rev. at 768; cf. *Young, supra* 216 S.E.2d at 592 (school owes students forced to associate with others a safe environment). Moreover, in a compulsory education system, *see* note 16, the parent does not voluntarily yield his authority over the child to the school, so the concept of delegated authority is of little use. *See generally Ingraham v. Wright,* 430 U.S. 651, 662, 97 S.Ct. 1401, 1407, 51 L.Ed.2d 711 (1977); *Young,* 216 S.E.2d at 592; 74 Nw.U.L.Rev. 803. We agree with most courts that school officials have special duties with associated powers, but we prefer not to tie them to the *in loco parentis* doctrine. Instead we view the school as a

special situation, in the same way that the border or an airport presents a special situation, requiring the courts to allow some intrusions on otherwise protected privacy.

19. We intimate no opinion as to the standards to be applied when a school official acts at the request of the police, calls in the police before searching, or turns over the fruits of his search to the police. In that situation, when there is some component of law enforcement activity in the school official's actions, the considerations may be critically different. *See, e.g., Picha v. Wielgos,* 410 F.Supp. 1214, 1219–21 (N.D.Ill. 1976); *State v. Mora,* 307 So.2d 317 (La.), *vacated,* 423 U.S. 809, 96 S.Ct. 20, 46 L.Ed.2d 29, *same result reached on reconsideration,* 330 So.2d 900 (La.1975), *cert. denied,* 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976).

20. *Contra, Stern v. New Haven Community Schools,* 529 F.Supp. 31 (E.D.Mich.1981). The *Stern* result illustrates the dangers of focusing on good intentions, for there the court approved the use of a two-way mirror in a boys' washroom.

involved in this case cannot be justified by the need to prevent abuse of drugs and alcohol when there is no individualized suspicion, and we hold it unconstitutional.

## C. The Further Searches.

 The plaintiffs urge that, even if the initial sniffing of the cars and lockers by the dogs is permissible, the dogs' reactions do not give the defendant a sufficiently strong basis for suspicion to justify a further search. The district court stated that the "generalized perception of a problem of drug and alcohol abuse" along with the positive reaction of the dog give the school sufficient cause to believe that the student occupant or driver has violated school policy to justify opening the locker or car and searching it. The court did not, however, make any finding on the reliability of the dogs, and there was no evidence in the record to support such a finding. In fact, although the representative of SAI asserted that the dogs were quite reliable, he admitted that there were no comprehensive records kept of those incidents when the dogs reacted positively in the absence of contraband. On this record, then, we cannot say whether the reaction of the dogs provided adequate cause for more intrusive searches, and summary judgment is inappropriate. Fed.R.Civ.P. 56(c). We remand to the district court for development of the record on that point. The standard enunciated by the district court, however, was proper: GCISD need not show that the dogs are infallible or even that they are reliable enough to give the defendant probable cause; instead, the dogs must be reasonably reliable. It will not, however, be enough to show that the dogs are reasonably reliable in indicating the presence or recent presence of contraband. If the reaction is to justify a search, it must give rise to reasonable suspicion that the search will produce something—i.e., reasonable suspi-

cion that contraband is *currently* present. If the school does have reasonable cause to suspect the presence of contraband, the ease with which it can be destroyed or moved presents an exigent circumstance that excuses the warrant requirement, *e.g., United States v. Petty,* 601 F.2d 883, 890 (5th Cir. 1979) (alternative holding), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980).

## III. THE DUE PROCESS VIOLATION.

The plaintiffs also argue that the use of the dogs violates their rights under the fourteenth amendment, by depriving them of a liberty interest without due process. Because of our disposition of the fourth amendment issues arising out of the sniffing of the students, *see* Part II, we need not decide whether that practice entails a due process violation. The question remains whether the presence of a dog on campus, and the practice of occasionally allowing him to play on campus unrestrained by a leash but supervised by the handler, constitute a violation of the due process clause.

The dogs trained and provided by SAI are large animals—usually German shepherds and Doberman pinschers, and occasionally Labradors—breeds selected because the animals are often sold to police forces who, according to the testimony of the SAI representative, use these dogs to maintain an image of strength and ferocity. The individual animals, however, are selected on the basis of their docility, and SAI has never received a complaint about the dogs' injuring anyone in any way.[21] The defendant goes to considerable pains to educate the younger students, who are more likely to be frightened, by introducing the dogs at assemblies and demonstrating their friendliness. Furthermore, there is nothing in the record to indicate that those students who

---

**21.** According to the representative of SAI, one student was scratched slightly when he played with one of the dogs, but he did not register any complaint. One who chooses to play with a large dog assumes the risk of incurring minor scratches and bruises in the rough-and-tumble,

and we think that the students can differentiate between an unprovoked attack and an incidental scratch. It is unlikely that such an incident contributes to the intimidation alleged by the plaintiffs.

do not wish to join in the play with the dogs cannot avoid them.[22]

We recognize that large dogs, particularly those breeds that are sometimes used as attack dogs, often engender an irrational fear, and we do question the wisdom of permitting them to roam parts of the campus unleashed. But, as long as the dogs are carefully selected for their nonaggressive character, and the handlers supervise them during their playtime, we do not think that the minimal "harassment" arising from their mere presence on campus rises to the level of a constitutional violation.[23]

## IV. CLASS CERTIFICATION.

The plaintiffs sought to maintain a class action under Rule 23, Fed.R.Civ.P. 23, requesting the district court to certify a class of all students currently enrolled in GCISD schools. The defendant opposed class certification, and the district court refused to certify the class.

The decision to grant or to deny certification is, as the defendant contends, initially committed to the sound discretion of the district judge, and the decision will not be overturned except for abuse of discretion. *See, e.g., Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1309

(9th Cir. 1977); *Gonzalez v. Southern Methodist University,* 536 F.2d 1071 (5th Cir. 1976), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977); 7 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1759, 1765 (1972). Nonetheless, the discretion of the district judge is not without limits; he must bear in mind the impact of a binding judgment on class members and the functions of the class action in facilitating assertion of certain types of claims or defenses and in avoiding repetitious litigation. And while considering these factors, he must determine whether the case meets the four requirements of Rule 23(a):

(1) The class must be so numerous that joinder of all members is impracticable;

(2) There must be questions of law or fact common to the class;

(3) The claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4) The representative parties must fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition, the action must fit within one of the categories of actions described in Rule 23(b).

In this case, the district judge offered no explanation of his denial of certifi-

---

**22.** We reiterate that we leave undecided whether the use of the dogs to sniff the students themselves would be a fourteenth amendment violation.

**23.** We have found no authority to the contrary, and the plaintiffs have cited none. The only cases cited by the plaintiffs deal with the possible existence of a liberty or property interest in the renewal of government employment and the possible existence of a liberty interest in one's reputation. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Any humiliation arising from the use of the dogs is, we think, limited to the use of the dogs to sniff the persons, which we have invalidated on other grounds. The mere presence of the dogs on campus is in no way humiliating; nor does it stigmatize the students, so the cases cited are factually inapposite. Assuming that the plaintiffs intend to draw an analogy between their interest in freedom from intimidation and the interests at issue in *Roth* and *Constantineau,* we think that *Paul v. Davis,* 424 U.S. 693, 96

S.Ct. 1155, 47 L.Ed.2d 405 (1976), which cut back severely the holding of *Constantineau,* and *Roth* work against the plaintiffs. Both require something beyond injury to some interest of the plaintiff to establish a violation of the due process clause. *Roth* required a legitimate claim of entitlement from a non-constitutional source, such as state law, to establish a protected property interest. Similarly, *Davis* required some change in legal status to make an injury to reputation a deprivation of a protected liberty interest, noting that the interests protected by the due process clause "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law." 424 U.S. at 710, 96 S.Ct. at 1164 (footnote omitted). The plaintiffs have not directed our attention to any state law entitlement protecting the interest they assert. Indeed, the record indicates that in Baytown, the site of most of GCISD, it is not a violation of the leash law for a dog to be off leash when supervised by a capable individual. *See* Newman Depo. at 64.

cation, stating only that "bald assertions will not support the requirements of proof necessary to satisfy Rule 23(a)." Although an unexplained decision renders review difficult, it need not preclude affirmance if there are obvious reasons justifying the district court's decision. *See, e.g., Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 597 (5th Cir. 1981); *Rhodes v. Amarillo Hospital District,* 654 F.2d 1148, 1153–54 & n.8 (5th Cir. 1981); *see also Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 245 n.6 (3rd Cir.), *cert: denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The cases cited by the district judge suggest that he denied certification because of his concern that the interests of the named plaintiffs may be antagonistic to those of some members of the proposed class.[24] *East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Aiken v. Neiman-Marcus,* 77 F.R.D. 704 (N.D.Tex. 1977). As the defendant argues, many students and parents may support the program as a potentially effective means of combating a serious problem of drug and alcohol abuse.

The district court identified correctly the cause for concern here as the adequacy of the named plaintiff, for it is clear that the case satisfies the other prerequisites to a class action.[25] First, the class includes 15,-400 members—all students enrolled in GCISD who are subject to the canine sniff searches. Even though the class members reside in a relatively small geographic area, the number renders joinder impracticable. Fed.R.Civ.P. 23(a)(1). Second, there are common questions of law and fact, including how the school district conducted the sniffing procedures and the subsequent body searches, whether the sniffing constitutes a search, and, if so, whether that search is unreasonable. Fed.R.Civ.P. 23(a)(2). Third, the claims of the named plaintiffs are typical of those of the class,

for all three of the named plaintiffs have been subjected to sniffing, and two of the named plaintiffs have been subjected to further searches, Fed.R.Civ.P. 23(a)(3). *See* note 34. Fourth, the party opposing the class has acted on grounds generally applicable to the class, so that injunctive and declaratory relief with respect to the class as a whole are appropriate, Fed.R.Civ.P. 23(b)(2), leaving only the adequacy of the named plaintiffs in question, Fed.R.Civ.P. 23(a)(4).

▌ The adequacy requirement mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees, *see, e.g., Jaurigui v. Arizona Board of Regents,* 82 F.R.D. 64 (D.Ariz.1979); *Klein v. Miller,* 82 F.R.D. 6, 8 (N.D.Tex.1978). Some aspects of this requirement are clearly satisfied. The zeal and competence of the named plaintiffs' counsel, an attorney practicing with a major Houston law firm and staff counsel of the American Civil Liberties Union, even had they been open to question at the outset, can no longer be challenged after their performance in prosecuting this appeal. Also, we see no reason to doubt the ability and willingness of the named plaintiffs and their next friend to participate in and control the litigation. Although the defendant contends that, at his deposition, the plaintiffs' next friend had not read the complaint and was unaware that he was representing others, examination of the transcript of his deposition shows that Horton stated only that he had not read the particular copy of the complaint presented, and he categorically stated that he was aware that he was representing a class. On the whole, Horton's deposition shows commendable familiarity with the complaint and with the concept of a class action. In that

---

**24.** The judge may have thought that the plaintiffs simply failed to meet their burden of proof. As our discussion will show, we disagree.

**25.** Technically, only the requirements of section (a) of Rule 23 are "prerequisites" to a class

action, and section (b) describes the categories of classes maintainable as class actions. The discussion here will treat qualification for a Rule 23(b) category as a prerequisite to class actions.

sense, the plaintiffs have established their adequacy to protect the interests of the class.[26]

 But the possibility of antagonism [27] within the class remains. Although the defendant has offered no proof of disagreement except the assertion that other parents and students have not complained about the practice, we see the chance that some class members support the canine search program as a very real possibility, and apparently the district judge agreed. In many similar cases, district judges have certified classes without discussing the problems raised by the possibility of antagonistic interests. *See, e.g., Lansdale v. Tyler Junior College,* 318 F.Supp. 529 (E.D.Tex.), *aff'd on other grounds,* 470 F.2d 659 (5th Cir. 1972) (en banc), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964 (1973); *Sullivan v. Houston Independent School District,* 307 F.Supp. 1328 (S.D.Tex.), *vacated,* 475 F.2d 1071 (5th Cir.), *cert. denied,* 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973); *Nolop v. Volpe,* 333 F.Supp. 1364 (D.S.D.1971); *see also Foster v. Sparks,* 506 F.2d 805 (5th Cir. 1975). In other cases, courts have been content simply to observe that unanimity can never be achieved in large classes and have proceeded on that basis to certify a class. *See Rosado v. Wyman,* 322 F.Supp. 1173, 1193–94 (E.D.N.Y.), *aff'd,* 437 F.2d 619 (2d Cir. 1970), *aff'd mem.,* 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971). Yet there is good au-

thority for denying class certification on the basis of significant disagreement within the class. *See, e.g., East Texas Motor Freight System, supra,* 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977) (alternative holding); *Peterson v. Oklahoma City Housing Authority,* 545 F.2d 1270, 1273 (10th Cir. 1976); *Swain v. Brinegar,* 517 F.2d 766 (7th Cir. 1975) (alternative holding), *reheard on merits,* 542 F.2d 364 (7th Cir. 1976) (en banc); *Ihrke v. Northern States Power Co.,* 459 F.2d 566 (8th Cir.), *vacated as moot,* 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972); *Schy v. Susquehanna Corp.,* 419 F.2d 1112 (7th Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Troup v. McCart,* 238 F.2d 289 (5th Cir. 1957) (alternative holding); *Giordano v. Radio Corporation of America,* 183 F.2d 558 (3rd Cir. 1950). It is true that in several of these cases, there was hard evidence of real disagreement. In *Peterson,* for instance, many of the tenants in a low-rent housing project had executed leases containing the security deposit provision that was the subject of the suit, and the defendant presented evidence that many of them thought that the security deposit would benefit members of the proposed class because it would lead to better care for neighboring units. Similarly, in *East Texas Motor Freight,* the members of the union local that included the class had voted against the relief sought by the plaintiffs. But in some cases, a realistic possibility of antago-

**26.** We reject the suggestion in the defendant's brief that a putative representative must present proof of financial resources in order to meet his burden of proof on the issue of adequacy. The case relied upon by the defendant holds only that the class opponent may undertake discovery of the putative representative's financial condition. *See Klein, supra.* In the absence of any reason to believe that the named plaintiffs have inadequate resources and particularly in the light of their proven ability to litigate and pursue an appeal, we think that the plaintiffs have met their burden on this issue. *See generally* Comment, *Class Certification: Relevance of Plaintiff's Finances and Fee Arrangements with Counsel,* 40 U.Pitt.L.Rev. 70, 82 (1978).

**27.** Intra-class antagonism may be analyzed under either Rule 23(a)(4), the adequacy require-

ment, or Rule 23(a)(3), the typicality requirement. See 7 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1768, 1769 (1972). The requirements are closely related, for demanding typicality on the part of the representative helps ensure his adequacy as a representative. We prefer to analyze the question of intra-class antagonism under the requirement that the representative protect adequately the interests of the class rather than under the requirement that his claims be typical, because each class member *has* the claim asserted by the plaintiffs, so the plaintiffs' claims are typical, but many members do not see it as in their best interests to assert that claim. The real question then is whether, in spite of the typicality of their claims, the named plaintiffs can adequately represent the interests of the class, including any interest in not asserting claims.

nism, without more, has resulted in a denial of certification. *See, e.g., Swain, supra; Ihrke, supra.* And since the burden of proof on certification issues is on the plaintiff,[28] we think it improper to demand much evidence from the defendant that a significant number of class members oppose the plaintiff when it is obvious that a real possibility of antagonism exists.

We perceive unresolved tension between the cases permitting certification in these circumstances and the leading case on adequacy of representation for purposes of binding class members, *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). In *Hansberry,* a number of landowners signed a covenant not to sell or lease to blacks. The covenant took effect only when signed by 95% of the landowners. One landowner brought a class action, on behalf of all the others, to enforce the covenant against parties who had acquired or asserted an interest in property formerly owned by one who had signed the covenant. The court granted enforcement on the basis of a fraudulent and collusive stipulation that 95% of the landowners had signed. In a second action brought by another landowner relying on the res judicata effect of the earlier action, the Illinois courts held the defendant bound by the earlier judgment as a member of the class. The Supreme Court reversed, holding that due process precluded binding a party to a judgment when neither had he had notice and an opportunity to be heard nor had he been adequately represented. In *Hansberry,* the representation in the first action had been inadequate. As the Court stated:

> It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation is either to assert a common right or challenge an asserted obligation. It is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class so that any group merely because it is of the class so constituted, may be deemed adequately to represent any others of the class in litigating their interests in either alternative. Such a selection of representatives ... does not afford that protection to absent parties which due process requires.

311 U.S. at 44–45, 61 S.Ct. at 119 (citations omitted).

■■■■ *Hansberry,* however, cannot be read to forbid class actions[29] in every case in which class members disagree. On the contrary:

> ... [i]n any conceivable case, some of the members of the class will wish to assert their rights while others will not wish to do so. Thus the familiar case of the stockholders' derivative suit is almost invariably brought by minority stockholders to challenge action that a majority of the stockholders approve. Yet it is routinely regarded as an appropriate class suit. Another familiar class suit is that in which one or more taxpayers of a community, suing on behalf of all, challenge the validity of a proposed public expenditure. It is difficult to believe that there has ever been such a case in which a good many of the taxpayers would not have preferred that their rights not be enforced, because of their interest in having the expenditure made. Yet no one has ever doubted the propriety of bringing such a suit as a class action.

Wright, *Class Actions,* 47 F.R.D. 169, 174 (1969). *Hansberry* holds that class members cannot be bound *solely* on the basis of the representative's membership in the class

---

**28.** *See, e.g., Aiken, supra* at 704; *see generally* 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1759 (1972).

**29.** *Hansberry,* of course, does not directly forbid class actions; it simply held that some class actions will not bind the class. But Rule 23(a) is designed to permit certification only in those cases in which the class can be bound and in which courts in subsequent actions would hold, consonant with due process, that res judicata barred any further litigation by class members on the cause of action. *See* Fed.R.Civ.P. 23(c)(3) (advisory committee note). Thus *Hansberry* indirectly prohibits class actions that will not bind the class.

if some members disagree, and, along with Rule 23(a), *Hansberry* directs courts to adopt procedures to protect the interests of absentees before purporting to bind them. Thus, the district court here was properly concerned, for *Hansberry* mandates concern for adequate protection of absent class members. But the concern need not preclude certification. The very existence of the class procedure suggests a policy in favor of making it available to litigants when possible. And the important functions served by class litigation—facilitating the assertion of claims and defenses and protecting the judicial system from repetitive litigation—also militate in favor of devoting some ingenuity to making the class device available. Rule 23 provides a district judge with great flexibility to adopt any appropriate procedures, issue appropriate orders, and invite intervention. *See generally Eisen v. Carlisle*, 391 F.2d 555, 563 (2d Cir. 1968). It explicitly permits him to certify conditionally or to decertify a class if it becomes apparent that the representation is inadequate,[30] indicating that judges should err in favor of certification. *See generally* 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1785 (1972).

In this case, a variety of techniques was available to the district judge. For instance, he could have ordered notice of the action and of the relief requested by the plaintiff to the other students and parents to be posted or distributed to the students at the schools, an effective and relatively inexpensive way to apprise other members of the litigation and to invite intervention to challenge the representation or to oppose the named plaintiffs.[31] Those who chose not to intervene would have received the notice and opportunity to be heard that fulfills the requirements of *Hansberry*. In addition, the trial judge could have certified the class conditionally, before considering the merits of the summary judgment motions, to provide time for disagreement among class members to come to his attention.

We think it unnecessary to undertake these procedures in this particular case, although their use might increase the protection of the absentees, for we think that the parties in this case protected the interests of all absentees, as required by *Hansberry*.[32] Though some members may disagree with the named plaintiffs, their position has been asserted energetically and forcefully by the defendant, which has argued that the school administration must be able to use these searches to combat a serious drug problem. *Accord, Dierks v. Thompson*, 414 F.2d 453, 457 (1st Cir. 1969); *Sturdevant v. Deer*, 73 F.R.D. 375 (E.D.Wis. 1976); *Rota v. Brotherhood of Railway, Airline & Steamship Clerks*, 64 F.R.D. 699 (N.D.Ill.1974); *see generally Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1476, 1481 (1976). In many cases, we would hesitate to rely on the opponent of the class to represent the views of dissenting class members. *Hansberry* itself illustrates all too clearly the dangers of collusion in such a case, for the court in the initial action there could have viewed the defendant landowner as the protector of the interests of all landowners opposing enforcement of the covenant. But in this case, the defendant vigorously opposed certification. In such circumstances, the possi-

---

30. Fed.R.Civ.P. 23(c)(1).

31. *Cf. Snyder v. Board of Trustees*, 286 F.Supp. 927, 931 (N.D.Ill.1968) (inviting dissenting members to intervene to request modification of the judgment or exclusion from the class).

32. A second consideration supporting our decision is that the absentee members will not be much better protected from the effect of the decision if we deny certification. In a case like this one, the stare decisis effect of our decision that the sniffing procedures as they relate to the students are unconstitutional will, as a

practical matter, put an end to all searches. *See Ihrke, supra; Snyder, supra; Rosado v. Wyman*, 322 F.Supp. 1173, 1194 (E.D.N.Y. 1970), *aff'd*, 437 F.2d 619 (2d Cir.), *aff'd mem*, 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971); 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1771 (1972); *see also Bailey v. Patterson*, 323 F.2d 201 (5th Cir. 1963), *cert. denied*, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964); *see generally Developments in the Law—Class Actions*, 89 Harv.L. Rev. 1318, 1486–87 (1976).

bility of collusion is virtually nil, and we can rely on the defendant to present to the court the arguments supporting the contention of any dissident absentees that the sniffing is not an unconstitutional search.[33] Consequently, we direct that a class of all students enrolled in GCISD be certified on the question of the constitutionality of the searches.[34]

## V. CONCLUSION.

We conclude that the use of dogs in dragnet sniff-searches of the students of GCISD is unconstitutional, but that the use of the dogs in similar dragnet sniffing of lockers and cars is not, and we direct the district court to grant relief by appropriate declaration and injunction. Although the use of the dogs in dragnet sniffing of lockers and cars is permissible, we must remand to the district court for the case to proceed to trial on the reliability of the dogs' reactions as the basis for further searches. We also direct certification of a class on the issue of the constitutionality of the practices.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**33.** There may also be disagreement among class members over appropriate relief. On that issue, we cannot depend on the defendant to represent the views of all absentees. As a result, we direct certification on the issue of liability only, a procedure explicitly provided by Rule 23(c)(4)(A).

**34.** The defendant suggested in the district court but has not argued before us that the case was moot as to Robby Horton and Sandra Sanchez, who were seniors when the complaint was filed. Robby did not graduate before the district court decision, but presumably he and Sandra have both graduated, and Heather is currently a junior. Even if the certification in

this case does not "relate back" to the filing of the complaint, *Sosna v. Iowa,* 419 U.S. 393, 402 n.11, 95 S.Ct. 553, 559 n.11, 42 L.Ed.2d 532 (1975), a question we need not and do not decide, at the time of certification Heather is still a member of the class she seeks to represent. · *Id.,* 419 U.S. at 402, 95 S.Ct. at 558. Her claims are typical, for her person as well as her locker and automobile are currently subject to sniffing and, if she or her property triggers an alert, the defendant's policy requires a further search.

